**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

LAURIE EXBY-STOLLEY,

     Plaintiff - Appellant,

v.

BOARD OF COUNTY
COMMISSIONERS, WELD
COUNTY, COLORADO,

     Defendant - Appellee.

------------------------------

UNITED STATES OF AMERICA;
COLORADO PLAINTIFF
EMPLOYMENT LAWYERS
ASSOCIATION; NATIONAL
DISABILITY RIGHTS NETWORK;
NATIONAL EMPLOYMENT
LAWYERS ASSOCIATION,

     Amici Curiae.

No. 16-1412

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:13-CV-01395-WYD-NYW)**

---

Jason B. Wesoky, Darling Milligan PC, Denver, Colorado, for Plaintiff-Appellant.

Alan Epstein (Thomas J. Lyons and Mark S. Ratner, with him on the brief), Hall
& Evans, L.L.C., Denver, Colorado, for Defendant-Appellee.

Anna Baldwin, Attorney, Appellate Section, Civil Rights Division, United States Department of Justice, Washington, D.C. (Eric S. Dreiband, Assistant Attorney General, Tovah R. Calderon, Attorney, United States Department of Justice, Washington, D.C.; James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Elizabeth E. Theran, Assistant General Counsel, and Gail S. Coleman, Attorney, Equal Employment Opportunity Commission, Washington, D.C., with her on the brief) filed an amicus curiae brief for the United States.

J. Bennett Lebsack, Lowrey Parady, LLC, Denver, Colorado, filed an amicus curiae brief for Colorado Plaintiff Employment Lawyers Association, National Disability Rights Network, and National Employment Lawyers Association.

---

Before **TYMKOVICH**, Chief Judge, **KELLY**, **BRISCOE**, **LUCERO**, **HARTZ**, **HOLMES**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **McHUGH**, **MORITZ**, **EID**, and **CARSON**, Circuit Judges.

---

**OPINION ON REHEARING EN BANC**

---

**HOLMES**, Circuit Judge, joined by **BRISCOE**, **LUCERO**, **MATHESON**, **BACHARACH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

---

In this en banc appeal, we address whether an adverse employment action is a requisite element of a failure-to-accommodate claim under Title I of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12111–12117. We conclude that the answer is "no," reaching this determination through a comprehensive analysis, including consideration of the following: the ADA's text; our failure-to-accommodate precedent; the failure-to-accommodate decisions of our sister circuits; the views of the Equal Employment Opportunity

2

Commission (the "EEOC"), the federal regulatory agency charged with administering the ADA; and the ADA's general remedial purposes.

The district court in this case had instructed the jury that, in order to prevail on her ADA failure-to-accommodate claim, Plaintiff-Appellant Laurie Exby-Stolley was required to establish that she had suffered an adverse employment action. Over a dissenting opinion, a panel of this court agreed and affirmed the district court's judgment. *See Exby-Stolley v. Bd. of Cty. Comm'rs*, 906 F.3d 900 (10th Cir. 2018) [hereinafter the Panel Majority]. We granted rehearing en banc. "In accordance with our local rule, the judgment was vacated, the mandate stayed, and the case was restored as a pending appeal." *United States v. Nacchio*, 555 F.3d 1234, 1236 (10th Cir. 2009) (en banc) (citing 10TH CIR. R. 35.6).

On en banc rehearing and following oral argument, we now hold that the district court erred: *viz.*, an adverse employment action is not a requisite element of an ADA failure-to-accommodate claim. Accordingly, we **reverse** the district court's judgment and **remand** for a new trial. Because we remand for a new trial and the original decision turned on trial-related issues, we vacate in full the decision (including the dissent). *See, e.g.*, *id.* ("vacat[ing] the panel opinion insofar as it reversed the district court's judgment"); *The Tool Box v. Ogden City*

3

*Corp.*, 355 F.3d 1236, 1243 (10th Cir. 2004) ("[W]e VACATE the panel decision and AFFIRM the district court's judgment.").

# I

This en banc appeal centers on a pure issue of law: whether an adverse employment action is a requisite element of an ADA failure-to-accommodate claim. Therefore, we need not recount at length here the facts and procedural history. We only discuss the factual and procedural background insofar as it is germane to our resolution of this appeal.

In 2013, Ms. Exby-Stolley sued her former employer, the Board of County Commissioners of Weld County, Colorado (the "County"). In particular, and as relevant here, Ms. Exby-Stolley contended that the County violated the ADA by failing to accommodate her disability. *See* 42 U.S.C. § 12112(a), (b)(5)(A). More specifically, she claimed that the County had not reasonably accommodated her even though she had informed it that her physical limitations resulting from a workplace injury were preventing her from adequately completing her work, and even though she also had proposed to it various reasonable accommodations. Ms. Exby-Stolley also alleged that, beyond not being accommodated, she was compelled to resign, which she in fact did prior to filing this suit. The County, beyond disputing that it had failed to make sufficient efforts to reasonably

4

accommodate Ms. Exby-Stolley, also alleged that her resignation had been voluntary.

In its post-trial instructions to the jury regarding Ms. Exby-Stolley's failure-to-accommodate claim, the district court stated that

> Plaintiff must prove each of the following facts by a preponderance of the evidence:
>
> 1. That Plaintiff had a "disability," as defined in these instructions;
>
> 2. That Plaintiff was a "qualified individual," as defined in these instructions;
>
> 3. That Plaintiff *was discharged from employment or suffered another adverse employment action by Defendant*; and
>
> 4. That Plaintiff's disability was a substantial or motivating factor that prompted Defendant to take that action.

Aplt.'s App., Vol. II, at 440 (Jury Instrs., filed Oct. 11, 2016) (emphasis added). The instructions specified that "[a]n adverse employment action constitutes a significant change in employment status, such a[s] hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 449.

In answers to special interrogatories, the jury found that Ms. Exby-Stolley had "proven by a preponderance of the evidence" both "that she had a disability, as defined in the instructions, at the time of the employment actions in question" and "that she is a qualified individual with a disability, as defined in the

5

instructions." *Id.* at 419 (Verdict Form, filed Oct. 11, 2016). But the jury nonetheless ruled in the County's favor, finding that Ms. Exby-Stolley had not "proven by a preponderance of the evidence" that she had been "[discharged from employment] [not promoted] [or other adverse action] by Defendant." *Id.* (brackets in original).

Ms. Exby-Stolley appealed, arguing in part that the district court erred in instructing the jury that she had to prove an adverse employment action as part of her failure-to-accommodate claim. Over a dissenting opinion, the Panel Majority affirmed the district court's judgment, concluding as relevant here that "an adverse employment action is an element of a failure-to-accommodate claim." *Exby-Stolley*, 906 F.3d at 905.

The Panel Majority acknowledged that "the language 'adverse employment action' does not appear in the ADA" but observed that it was "well established in judicial opinions" in the Title VII context, where this language has been used as a "shorthand" for language that is materially similar to the terms-conditions-and-privileges-of-employment language of § 12112(a) of the ADA. *Id.* at 906–07. And the Panel Majority deemed it "natural to use the same shorthand—adverse employment action—for this statutory language in the ADA as is used for like language in Title VII." *Id.* at 908. It "is clear from the language of § 12112," reasoned the Panel Majority, that "[t]he terms-and-conditions-of-employment

6

language"—and, consequently, the shorthand, adverse-employment-action language—"applies to failure-to-accommodate claims under the ADA." *Id.* at 907. And, critically, the Panel Majority concluded that "proof of a failure to accommodate does not automatically satisfy the terms-and-conditions language"—in other words, "[e]ven after proof of a failure to accommodate, there remains the requirement that the discrimination be 'in regard to job application procedures, . . . [or] other terms, conditions, or privileges of employment.' That is, the employee still needs to prove this component of an ADA discrimination claim based on a failure to accommodate." *Id.* at 908 (second alteration and omission in original) (quoting 42 U.S.C. § 12112(a)). And, because the adverse-employment-action language is simply shorthand for this additional terms-conditions-and-privileges-of-employment requirement, "it is evident" said the Panel Majority, that plaintiffs must establish an adverse employment action even where their ADA claim is "based on failure to make reasonable accommodations." *Id.* at 911.

This court subsequently agreed to rehear the case en banc, requesting supplemental briefing specifically as to whether the district court erred when it

7

instructed the jury that an adverse employment action is a requisite element of a failure-to-accommodate claim under the ADA. We turn now to that question.[1]

## II

### A

"We review de novo whether, 'as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards.'" *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 992 (10th Cir. 2019) (quoting *Martinez v. Caterpillar, Inc.*, 572 F.3d 1129, 1132 (10th Cir. 2009)); *accord Davoll v. Webb*, 194 F.3d 1116, 1131 (10th Cir. 1999). The foundational governing law in this case is found in the ADA's text.

42 U.S.C. § 12112(a), entitled "General rule," provides the general, employment-discrimination proscription of Title I of the ADA, stating that

> [n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

---

[1]    In this en banc appeal, with one notable exception—that is, the undue-hardship issue, which we resolve *infra* in Part IV—we do not address the other matters that Ms. Exby-Stolley argued before the panel, specifically, whether the district court erred in refusing to either allow her to instruct the jury on a claim of constructive discharge or to argue constructive discharge in closing argument. The district court may address those matters on remand.

42 U.S.C. § 12112(a)[2]; *see PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) ("To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." (footnotes omitted)).

Subsection 12112(b), entitled "Construction," is inextricably intertwined with § 12112(a)'s "General rule." Critically, § 12112(b) particularizes and makes concrete this rule by offering in non-comprehensive fashion examples of the kinds of disability discrimination that qualified individuals may be subjected to "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). (We frequently refer to the latter, quoted language of § 12112(a), in brief, as "the terms-conditions-and-privileges-of-employment language.") As most relevant here, subsection (b) provides the following:

> As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes–
>
> . . . .

---

[2] A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

9

**(5)(A)** not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

*Id.* § 12112(b).

It is undisputed that the language "adverse employment action" does not expressly appear in the plain terms of the failure-to-accommodate statutory provision, § 12112(b)(5)(A), nor in the "General rule" of § 12112(a) that the failure-to-accommodate provision particularizes. And, for the reasons that we discuss at length below, we conclude that the district court erred when it charged the jury that an adverse employment action is a requisite element of a failure-to-accommodate claim.

We put aside for the moment—but return to later—the fact that by charging the jury in this fashion, the district court effectively added language to the ADA's plain text (i.e., "adverse employment action"); ordinarily, as here, this is an impermissible method of interpreting the governing statutory law. *See, e.g.*, *Dean v. United States*, 556 U.S. 568, 572 (2009) (noting that "we ordinarily resist reading words or elements into a statute that do not appear on its face") (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997))); *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 939 (10th Cir. 1996) ("Where statutory language is clear

10

and unambiguous, that language is controlling and courts should not add to that language."). That is because, perhaps most critically, the incorporation of an adverse-employment-action requirement into an ADA failure-to-accommodate claim is squarely at odds with, among other things, our own precedent; the views of the EEOC—the agency responsible for administering the ADA; and the regularly followed practices of all of our sister circuits. Let us explain.

**B**

More specifically, the district court's incorporation of an adverse-employment-action requirement into an ADA failure-to-accommodate claim was contrary to (1) our controlling precedent; (2) the inherent nature of a failure-to-accommodate claim, as contrasted with a disparate-treatment claim; (3) the general remedial purposes of the ADA; (4) the EEOC's understanding of the elements of an ADA failure-to-accommodate claim; and (5) the regularly followed practices of all of our sister circuits. We address these matters in turn.

**1**

Our controlling precedents make clear that an adverse employment action is not a requisite element of a failure-to-accommodate claim. For starters, our precedents have repeatedly and invariably presented the prima facie case for an ADA failure-to-accommodate claim without mentioning an adverse-employment-action requirement. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir.

11

2018) (noting that under the "modified *McDonnell Douglas* burden-shifting framework" governing failure-to-accommodate claims, a plaintiff may establish a prima facie case by demonstrating "that '(1) [he] is disabled; (2) [he] is otherwise qualified; and (3) [he] requested a plausibly reasonable accommodation'" (alterations in original) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017))); *see also Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.4 (10th Cir. 2004); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999) (en banc). Moreover, we have made clear that these articulations of the prima facie case for a failure-to-accommodate claim *exhaustively* enumerate the essential elements of that claim. *See, e.g.*, *Lincoln*, 900 F.3d at 1204 (stating, under the heading "Standard governing claim & burden of proof framework," not only the prima facie case for an ADA failure-to-accommodate claim, but also the employer's subsequent proof burden of undue hardship where the prima facie case has been satisfied, without even an intimation that such satisfaction of the prima facie case requires the plaintiff to demonstrate an adverse employment action); *Punt*, 862 F.3d at 1050 (similarly presenting an ADA failure-to-accommodate claimant's initial burden and the employer's contingent burden, with complete silence as to an adverse-employment-action requirement); *Smith*, 180 F.3d at 1179 (describing the prima facie case for an ADA failure-to-accommodate claim—which the court presented without an adverse-employment-action

12

requirement—as what the plaintiff must show "[t]o survive summary judgment on an ADA claim of failure to accommodate"); *cf. MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1440 (10th Cir. 1996) (indicating, in an ADA case, that the establishment of a prima facie case means that a "reasonable jury could return a verdict in [the plaintiff's] favor").

An appellate court that effectively declares that it is comprehensively delineating the elements of "a prima facie failure to accommodate claim," *Bartee*, 374 F.3d at 912 n.4, but instead then excludes an *ostensibly* essential element of that claim—that is, an adverse-employment-action requirement—would run a serious risk of misleading lower courts and the public about the contours of the law. We are not inclined to believe that our colleagues—in our previous failure-to-accommodate cases—would be so careless. Rather, we are confident that they omitted an adverse-employment-action element from their comprehensive statements of the prima facie case for an ADA failure-to-accommodate claim for a reason: *viz.*, there is no such element in an ADA failure-to-accommodate claim.

Moreover, the telling omission of an adverse-employment-action requirement from our prior articulations of the ADA prima facie case for a failure-to-accommodate claim is perhaps especially notable, given that where an adverse employment action is a required element of other claims, whether under the ADA or otherwise, we have not been reticent to acknowledge that. *See, e.g.*,

13

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1122 (10th Cir. 2013) (stating that "[i]n [Title VII] religio[us]-accommodation cases, . . . . [t]he prima facie case requires the employee to 'show that (1) he or she had a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed his or her employer of this belief; and (3) *he or she was fired* [*or not hired*] *for failure to comply with the conflicting employment requirement*'" (final alteration in original) (emphasis omitted in second clause, and emphasis added in third clause) (quoting *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000)), *rev'd on other grounds*, 575 U.S. 768 (2015))[3]; *EEOC v.*

---

[3]     The fact that we have required an adverse employment action to support *Title VII* religious-accommodation claims, *see Abercrombie & Fitch Stores*, 731 F.3d at 1122; *Thomas*, 225 F.3d at 1155, does not militate in favor of including such a requirement for *ADA* failure-to-accommodate claims. Significantly, whereas under the ADA a failure-to-accommodate claim is a freestanding claim of discrimination based on a failure to meet an affirmative duty, *see* 42 U.S.C. § 12112(a), (b)(5)(A), Title VII does not have such a freestanding claim; any claim under Title VII must necessarily be brought under the rubric of a disparate-treatment claim or disparate-impact claim, *see EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 135 S. Ct. 2028, 2032 (2015) ("[T]he 'disparate treatment' . . . provision and the 'disparate impact' provision[] are the only causes of action under Title VII.").

And the Tenth Circuit and Supreme Court Title VII cases concerning the failure to accommodate an employee's religion that mention an adverse-employment-action requirement are specifically addressing disparate-treatment claims. *See, e.g.*, *Abercrombie & Fitch Stores*, 135 S. Ct. at 2033 (referring to the claim at issue as a "disparate-treatment claim[] *based on a failure to accommodate a religious practice*" (emphasis added)); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66, 71 (1977) (citing 42 U.S.C. § 2000e-2(a)(1),

(continued...)

14

*C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011) (stating, in the context of describing an ADA disparate-treatment claim under § 12112(b)(1), that, "as part of their prima facie case . . ., the [plaintiffs] must demonstrate that [they] suffered from an 'adverse employment action'" (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001))); *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (including adverse employment action as element of prima facie case "[i]n racial discrimination suits . . . brought under . . . Title VII" (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005))); *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (including adverse employment action as element of prima facie case for Title VII sex- and pregnancy-discrimination claims); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) ("In order to establish a prima facie case [for an

[3](...continued)
Title VII's disparate-treatment provision, in discussing the claim at issue); *Abercrombie & Fitch Stores*, 731 F.3d at 1116 (same); *Thomas*, 225 F.3d at 1154 (same); *see also* Amina Musa, *'A Motivating Factor' – The Impact of* EEOC v. Abercrombie & Fitch Stores, Inc. *on Title VII Religious Discrimination Claims*, 61 St. Louis U. L.J. 143, 155 n.87 (2016) (noting that "the [*Abercrombie*] majority . . . stated that Title VII creates just two causes of action," and observing that religious-accommodation claims are "merged in with the definition of 'religion' under Title VII's 'disparate treatment' provision"). That a disparate-treatment claim—under Title VII *or* the ADA—would require an adverse employment action is wholly unremarkable, as we examine in Part II.B.2 *infra*. *See, e.g.*, *Lincoln*, 900 F.3d at 1191–93; *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). However, this fact sheds no light on the entirely separate question of whether such a requirement exists for failure-to-accommodate claims under the ADA, where a freestanding claim exists for such unlawful conduct.

15

ADA retaliation claim], Plaintiff must show: . . . 2) she was subjected to adverse employment action subsequent to or contemporaneous with the protected activity; . . . ."); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998) (including adverse employment action as element of prima facie case for involuntary-transfer claim under the Age Discrimination in Employment Act and Title VII); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997) ("[I]n order to establish a prima facie case of 'association discrimination' under [the ADA], a plaintiff must demonstrate the following: . . . (2) the plaintiff was subjected to adverse employment action; . . . ." (italics omitted)).

Beyond repeatedly omitting an adverse-employment-action requirement from comprehensive articulations of the prima facie case for ADA failure-to-accommodate claims, our cases have frequently made other statements in stark conflict with the ostensible existence of an adverse-employment-action requirement for failure-to-accommodate claims. For instance, in *Bartee*, we juxtaposed the elements of an ADA disparate-treatment claim with the elements of an ADA failure-to-accommodate claim. And, in so doing, we observed that the element in the former of an adverse employment action—in that instance, a termination of employment—was not an element of the latter. *See* 374 F.3d at 912 n.4 ("To present a claim of wrongful termination, [the plaintiff] must show: (1) he is disabled within the meaning of the ADA; (2) he can perform,

16

either with or without reasonable accommodation, the essential functions of the desired job; and (3) 'that [the defendant] terminated him because of his disability.' To present a prima facie failure to accommodate claim, *the first two elements remain the same*, while the third is met by showing that 'an employer [did not] take reasonable steps to [accommodate the employee].'" (third alteration in original) (emphasis added) (citation omitted) (first quoting *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir. 1995), and then quoting *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004))). Similarly, in *C.R. England*, we discussed several claims under the ADA and made clear that both disparate-treatment and retaliation claims require an adverse employment action. *See* 644 F.3d at 1039, 1050–51. However, we sandwiched between our discussion of disparate-treatment claims and retaliation claims a discussion of failure-to-accommodate claims, and there we made no mention of an adverse-employment-action requirement. *See id.* at 1048–50.[4]

---

[4] We observed in *C.R. England* that "[i]n order to demonstrate 'discrimination,' a plaintiff *generally* must show that he has suffered an 'adverse employment action because of the disability.'" 644 F.3d at 1038 (emphasis added) (footnote omitted) (quoting *Mathews*, 263 F.3d at 1167). But we noted that we were making this statement specifically and exclusively in connection with a *disparate-treatment* claim brought under § 12112(b)(1). *See id.* at 1038 n.10 ("The parties acknowledge that in order to prevail on his ADA discrimination claim, [the employee] must demonstrate some sort of 'adverse' action or 'adverse' effect on his employment. . . . Indeed, ADA § [12112(b)(1)] —upon which the EEOC's discrimination claim is based—only prohibits

(continued...)

Additionally, we have stated on multiple occasions that the ADA "establishes a cause of action for disabled employees *whose employers fail to reasonably accommodate them*." *Id.* at 1048 (emphasis added) (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001))). This general statement says nothing about the ostensible need for such disabled employees to *also* demonstrate an adverse employment action before their failure-to-accommodate claim will be viable.

Similarly, as we have expressly noted, the ADA imposes on "the employer . . . an *affirmative obligation* to make a reasonable accommodation," *Thomas*, 225 F.3d at 1155 n.5 (emphasis added), and we have referred to this duty as an "*unvarnished obligation*," *Smith*, 180 F.3d at 1169 (emphasis added); *accord C.R. England*, 644 F.3d at 1049 (referring to the employer's "duty" and "obligation" to provide reasonable accommodations). It is hard to imagine that a federal statute might place an "affirmative" or "unvarnished" obligation on an employer, and yet expose that employer to absolutely no consequences for breaching the obligation, so long as that employer does not take some additional action—that is, an adverse

---

[4](...continued)
'limiting, segregating, or classifying a[n] . . . employee *in a way that adversely affects the opportunities or status* of such . . . employee because of the disability of such . . . employee.'" (third alteration in original) (second, third, and fourth omissions in original) (quoting 42 U.S.C. § 12112(b)(1))).

employment action. And, consistent with the statements in our controlling precedent, we are disinclined here to read the ADA in such an unnatural manner.

Finally, in our discussions of the overarching features of ADA discrimination claims, we also have made clear that an ADA failure-to-accommodate claim does not contain an adverse-employment-action requirement. As a general matter in an ADA discrimination claim, we have stated that "an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015) (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004)). Yet, moving down a level of specificity, our cases have made clear that the third element of this general test—that the individual was "discriminated against because of her disability"—is satisfied in a failure-to-accommodate claim *as soon as* the employer, with adequate notice of the disabled employee's request for some accommodation, fails to provide a reasonable accommodation. *See C.R. England*, 644 F.3d at 1048 ("[A]n employer can unlawfully 'discriminate' against an employee by failing to 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee.'" (omission and

19

second alteration in original) (quoting 42 U.S.C. § 12112(b)(5)(A))); *Smith*, 180 F.3d at 1169 ("[A]n employer *discriminates* against a qualified individual with a disability if the employer fails to offer a reasonable accommodation."); *id.* at 1178 n.12 ("[A] failure to offer a reasonable accommodation to an otherwise qualified disabled employee *is* unlawful discrimination.").  In other words, under our precedent, once plaintiffs have established their employers' failure to reasonably accommodate their disability, they need not go further and establish that they have suffered an adverse employment action.  The district court erroneously deviated from this settled precedent in its jury instructions.

**2**

Any attempt to incorporate an adverse-employment-action requirement into an ADA failure-to-accommodate claim likely stems from "confusion . . . [in] failing to clearly differentiate between disparate treatment and failure to accommodate claims": the former require a showing of an adverse employment action but the latter do not.  Megan I. Brennan, *Need I Prove More: Why an Adverse Employment Action Prong Has No Place in a Failure to Accommodate Disability Claim*, 36 HAMLINE L. REV. 497, 501 (2013); *cf. EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014) ("A failure-to-accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered adverse employment action.").

20

More concretely, disparate-treatment claims under the ADA allege that the employer discriminated against the employee by *acting* in a discriminatory manner. *See, e.g.*, 42 U.S.C. § 12112(b)(1) (labeling as discrimination "*limiting, segregating, or classifying* a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee" (emphasis added)); *id.* § 12112(b)(6) (labeling as discrimination "*using* qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability" (emphasis added)). It thus necessarily follows that a plaintiff must establish an employment *action* as part of an ADA disparate-treatment claim. *See, e.g.*, *C.R. England*, 644 F.3d at 1038 (while describing an ADA disparate-treatment claim, stating that "a plaintiff generally must show that he has suffered an 'adverse employment *action* because of the disability'" (emphasis added) (quoting *Mathews*, 263 F.3d at 1167)).

On the other hand, failure-to-accommodate claims do not allege that the employer *acted*, but rather that the employer *failed to act*. *See* 42 U.S.C. § 12112(b)(5)(A) (listing, as the basis of a failure-to-accommodate claim, "*not making* reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" (emphasis added)). That is, failure-to-accommodate claims concern an omission rather than an action; such

21

claims allege that the employer discriminated against the employee by not satisfying an affirmative, ADA-created duty to provide reasonable accommodations. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) ("[The ADA] *requires preferences* in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy." (first emphasis added)); *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) ("In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. . . . *The concern is compelling behavior, not policing an employer's actions* that, when accompanied by an invidious discriminatory intent, are unlawful." (emphasis added)); *Thomas*, 225 F.3d at 1155 n.5 (stating that under the ADA, "the employer has an *affirmative obligation* to make a reasonable accommodation" (emphasis added)); *Smith*, 180 F.3d at 1169 (describing the ADA's requirement for employers to make reasonable accommodations as an "*unvarnished obligation*" (emphasis added)); *see also Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) ("*In addition to prohibiting adverse employment actions* against disabled persons because of their disabilities, the ADA requires employers *to make reasonable accommodations* for the disabilities of qualified individuals." (emphases added)); *Davidson v. Am. Online, Inc.*,

22

337 F.3d 1179, 1188–89 (10th Cir. 2003) (distinguishing between "disparate treatment," which "means *treating* 'a qualified individual with a disability' differently because of the disability," and "failing to provide a reasonable accommodation," which means "*not making* reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual" (emphases added) (quoting 42 U.S.C. § 12112(b)(5)(A))).

And because the ADA's reasonable-accommodation mandate focuses on "compelling behavior" rather than "policing an employer's actions," *Peebles*, 354 F.3d at 767, it would make little sense to require the showing of an adverse employment *action* as part of a failure-to-accommodate claim. In other words, it would verge on the illogical to require failure-to-accommodate plaintiffs to establish that their employer *acted* adversely toward them—when the fundamental nature of the claim is that the employer *failed to act*.

This distinction between disparate-treatment claims and failure-to-accommodate claims under the ADA also explains in part why the question of intent is treated quite differently as to each. In particular, since disparate-treatment claims concern discrimination in the form of an *action*, it naturally follows that a plaintiff alleging such a claim of discrimination must establish, *inter alia*, that there was both an employment action and that the action was undertaken with an intent that made it discriminatory, or phrased differently, that

23

the action was taken "because of the disability." *Davidson*, 337 F.3d at 1188. On the other hand, because failure-to-accommodate claims concern discrimination in the form of a failure to meet an affirmative obligation, there is no *action* that must be shown to have been taken with any particular intent. *See, e.g.*, Kevin W. Williams, *The Reasonable Accommodation Difference: The Effect of Applying the Burden Shifting Frameworks Developed Under Title VII in Disparate Treatment Cases to Claims Brought Under Title I of the Americans with Disabilities Act*, 18 BERKELEY J. EMP. & LAB. L. 98, 152 (1997) (stating that, in contrast to disparate-treatment claims, failure-to-accommodate claims require no showing of discriminatory intent; rather, for failure-to-accommodate claims, "the 'elusive factual question' to be determined is whether the employer *complied with its statutory obligation to provide reasonable accommodation*" (emphasis added)).

That is, in the context of a failure-to-accommodate claim, once an employee "make[s] an adequate request [for an accommodation], thereby putting the employer on notice," *C.R. England*, 644 F.3d at 1049, an employer's "failure to offer a reasonable accommodation to an otherwise qualified disabled employee *is* unlawful discrimination," *Smith*, 180 F.3d at 1178 n.12—irrespective of whether the employer harbored invidious intent (or discriminatory animus) toward the employee when the employer failed to act. *See Punt*, 862 F.3d at 1048 ("There is at least one type of ADA claim, however, which does not require any

24

evidence of discriminatory intent, whether direct or circumstantial: a failure-to-accommodate claim. . . . [T]he employer's failure to provide a reasonable accommodation for the disability establishes the required nexus between the disability and the alleged discrimination without the need to delve into the employer's subjective motivations."); *Peebles*, 354 F.3d at 767 (stating that for ADA failure-to-accommodate claims, unlike disparate-treatment claims, "[t]he concern is compelling behavior, *not policing an employer's actions that, when accompanied by an invidious discriminatory intent, are unlawful.* As such, it is *not* the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer *fails to abide by a legally imposed duty*" (emphases added)). It is likely—we must respectfully submit—that the district court here was mistaken or "confus[ed]," Brennan, *supra*, at 501, regarding the foregoing matter, that is, concerning the important distinctions between disparate-treatment claims and failure-to-accommodate claims under the ADA, when it incorporated an adverse-employment-action element, suitable for the former (i.e., a disparate-treatment claim), into the jury instruction for the latter (i.e., a failure-to-accommodate claim).[5]

---

[5] A further clue that the district court was likely mistaken or confused in this manner is found in the fourth element of the court's ADA failure-to-

(continued...)

Moreover, introducing an adverse-employment-action requirement into an ADA failure-to-accommodate claim would significantly frustrate the ADA's remedial purposes. *Cf. Hamer v. City of Trinidad*, 924 F.3d 1093, 1100, 1106 (10th Cir. 2019) (holding that the repeated-violations doctrine, which "divides what might otherwise represent a single, time-barred cause of action into several separate claims," applies to claims under Title II of the ADA in part because the ADA's "goal[] of full participation" is "consistent with and suggestive of the repeated violations doctrine" (emphasis omitted) (quoting Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271, 275 (2008))); *Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016) (stating that a "statute's . . . purpose" is one of the traditional "tools" of statutory construction (quoting *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004))); *N.Y. State Dep't of Soc. Servs. v.*

---

[5](...continued) accommodate jury instruction, where the court appears to have required the jury to determine whether the County acted with invidious intent. *See* Aplt.'s App., Vol. II, at 440 (requiring Ms. Exby-Stolley to establish that her "disability was a substantial or motivating factor that prompted Defendant to take that action"). As noted, such invidious intent is irrelevant in an ADA failure-to-accommodate claim. *See, e.g.*, *Punt*, 862 F.3d at 1048; Williams, *supra*, at 152.

*Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

The ADA's purposes include "assuring . . . 'full participation'" in society for individuals with disabilities, as well as "equality of opportunity," *C.R. England*, 644 F.3d at 1037 (quoting *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 858 (10th Cir. 2003), *overruled on other grounds as recognized by Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012)); *see* 42 U.S.C. § 12101(a)(7), so that disabled individuals may "compete on an equal basis and . . . pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(8). *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999) ("The ADA seeks to . . . guarantee [disabled] individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity."); *Hamer*, 924 F.3d at 1106 (mentioning "Congress's goal[] of full participation" in enacting the ADA).

And these purposes of promoting full participation and equal opportunity are effectuated in meaningful part by the "affirmative obligation" that the ADA places on covered employers "to make a reasonable accommodation." *Thomas*, 225 F.3d at 1155 n.5; *see US Airways*, 535 U.S. at 397 ("[The ADA] requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the *same* workplace opportunities that those without

27

disabilities automatically enjoy."); *Peebles*, 354 F.3d at 767 ("The [ADA] compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts."); *Smith*, 180 F.3d at 1168 ("[B]y defining discrimination [in the ADA] . . . to include the failure to offer reasonable accommodations, one of Congress' objectives was to facilitate economic independence for otherwise qualified disabled individuals."); EEOC Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.9 ("The reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated. . . . The reasonable accommodation that is required . . . should provide the individual with a disability with an equal employment opportunity. Equal employment opportunity means an opportunity to *attain the same level of performance*, or to enjoy the same level of benefits and privileges of employment as are available to the average similarly situated employee without a disability." (emphasis added)).

Those purposes, and the ability of the ADA's reasonable-accommodation mandate to promote them, would be significantly frustrated by including an adverse employment action as a necessary element of a failure-to-accommodate claim. Employers would *not* be held accountable for failing to reasonably

28

accommodate their disabled employees so long as those employers did not also subject their employees to an adverse employment action. How could the ADA's reasonable-accommodation mandate meaningfully help to ensure that qualified individuals with disabilities who have been denied a reasonable accommodation can "obtain the *same* workplace opportunities that those without disabilities automatically enjoy," *US Airways*, 535 U.S. at 397, and "enjoy the same level of benefits and privileges of employment" as their peers without disabilities, 29 C.F.R. pt. 1630, app. § 1630.9, if the statute is construed as providing such disabled individuals a failure-to-accommodate remedy *only* when their employers *also* have subjected them to an adverse employment action? To ask the question is to answer it: the ADA could not meaningfully effectuate its full-participation and equal-opportunity purposes, if so interpreted. And we thus decline to construe the statute in this way.

To make the matter more concrete, consider the following hypothetical. Imagine that a judge of this court hires a blind law clerk who can, without accommodation, write two draft judicial opinions per month. Also assume that the widely accepted standard for a successful law clerk is one who can write three draft judicial opinions per month, and that the blind law clerk can reach that level with the help of a reasonable accommodation. Further assume, for purposes of this hypothetical only, the following: (1) that a qualified, low-wage personal

29

reader would constitute such a reasonable accommodation under the ADA, *see* 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to potentially include "the provision of qualified readers or interpreters"), and (2) that such a reader undisputedly would not impose an undue hardship on the office operations of the blind law clerk's employer (i.e., the judge), *see id.* § 12112(b)(5)(A) (allowing an employer to avoid liability for failing to provide a reasonable accommodation to "an otherwise qualified individual with a disability" if the employer "can demonstrate that the accommodation would impose an undue hardship" on the operation of the employer's business). Now imagine that the judge denies the blind law clerk's request for this assumed reasonable accommodation and refuses to discuss any other possible reasonable accommodation—simply telling the law clerk that drafting two opinions per month is minimally sufficient and actually about what the judge expected, given the law clerk's blindness, and that this level of production will be just fine, even though the judge's other law clerks regularly reach the three-opinion, monthly target.

The law clerk in this hypothetical has suffered no adverse employment action as defined in our precedent and in the jury instructions at issue in this case—that is, the law clerk has not been subjected to "a *significant change in employment status*, such a[s] . . . firing, [or a] fail[ure] to promote." Aplt.'s

30

App., Vol. II, at 449 (emphasis added); *see Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (using the same definition of "adverse employment action"); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237–38 (10th Cir. 2004) (same). But, by not being reasonably accommodated, the blind law clerk surely has been prevented from fully participating in society and, more specifically, achieving the law clerk's full professional potential in the law clerk's position. *Cf. Hamer*, 924 F.3d at 1106 (noting that "[a] qualified individual is not a full participant or fully included in a service, program, or activity if she cannot utilize it in a similar way as persons without disabilities"). More specifically, this law clerk has been prevented from "compet[ing] on an equal basis" with her fellow law clerks who do not have disabilities, 42 U.S.C. § 12101(a)(8), and "enjoy[ing] the same level of . . . privileges of employment" as those law clerks, 29 C.F.R. pt. 1630, app. § 1630.9.[6] We are disinclined to adopt a reading of the ADA's failure-to-accommodate proscription that would yield such an outcome.[7]

---

[6] During the en banc oral argument, we posed a hypothetical to the County that resembled this one in all material respects, and the County affirmatively agreed that the blind law clerk would have been denied an opportunity to fulfill her potential as a law clerk and that the ADA protects against exactly that outcome. *See* Oral Arg. at 55:01–56:32.

[7] Without much difficulty, we could envision a similar private-sector scenario—say, a salesperson who suffers from a hearing disability who works at a telephone call center selling satellite-television services. The employee is meeting the employer's required sales targets but aspires to be the top salesperson in the company—for the prestige that comes with such an achievement and to

(continued...)

31

Put otherwise, the ADA's failure-to-accommodate proscription would not be operating in a manner consistent with Congress's purposes of promoting full participation and equality of opportunity if employees such as the blind law clerk in our hypothetical could not invoke the ADA simply because they have not been subjected to an adverse employment action; in those circumstances, such employees would be effectively impeded from operating at full capacity and

[7](...continued) enhance her resume for future career opportunities—and believes that this can be accomplished if she receives a reasonable accommodation. And assume, for purposes of this hypothetical only, the following: (1) that certain modifications to her company phone allowing her to more easily hear and converse with customers would constitute such a reasonable accommodation under the ADA, *see* 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to potentially include "acquisition or modification of equipment or devices"), and (2) that such a reasonable accommodation unquestionably would not impose an undue hardship on the employer's business operations. However, the employer denies the employee's request for this assumed reasonable accommodation—without even exploring with her other possible reasonable accommodations—saying simply that the employee's performance is good enough. Though this employee has not been fired, demoted, or otherwise suffered "a *significant change in employment status*," Aplt.'s App., Vol. II, at 449 (emphasis added), it is beyond peradventure that the employee has been denied an opportunity "to compete on an equal basis" with her fellow salespersons and the chance "to pursue those opportunities for which our free society is justifiably famous," 42 U.S.C. § 12101(a)(8). An interpretation of the ADA's failure-to-accommodate claim that would permit such a result is one to be avoided. *See Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 239 (D.C. Cir. 2018) (holding that a reasonable jury could find that plaintiff, a disabled amputee, satisfied the requirements of an ADA failure-to-accommodate claim against his private nonprofit employer and, more specifically, that "[a] reasonable jury could conclude that forcing [the plaintiff] to work with pain when that pain could be alleviated by his requested accommodation violates the ADA"), *cert. denied*, 139 S. Ct. 1201 (2019).

"attain[ing] the same level of performance" as their peers who are not disabled.

29 C.F.R. pt. 1630, app. § 1630.9; *cf. Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716,

723–24 (N.D. Ill. 2003) (invoking "the purposes of the reasonable accommodation

requirement" and recognizing that an employer "cannot escape liability under the

ADA just because its failure to accommodate did not result in an adverse

employment action" to the employee).[8]

---

[8] The foregoing analysis should reveal the inherent weakness of the critique of the Dissent (McHugh, J.) of the blind-law-clerk hypothetical. *See* Dissent (McHugh, J.) at 12–13, 37–43 [hereinafter the Principal Dissent]. First, it is not enough under the ADA that the judge did not subject the blind law clerk to an adverse employment action; instead, the judge had an "unvarnished obligation," *Smith*, 180 F.3d at 1169, to reasonably accommodate the clerk's visual limitation so that the clerk could "compete on an equal basis and . . . pursue those opportunities for which our free society is justifiably famous," 42 U.S.C. § 12101(a)(8). More specifically, the judge could not just "allocate work in chambers *with consideration* for the clerk's limitations," Principal Dissent at 13 (emphasis added); the judge was legally obligated to reasonably accommodate the clerk's limitation, *see, e.g.*, *Peebles*, 354 F.3d at 767; *Thomas*, 225 F.3d at 1155 n.5. And, contrary to the Principal Dissent's suggestion, it is pellucid that Congress—in making concrete in the ADA's text its full-participation and equal-opportunity purposes—did not deem the imposition on employers of such an affirmative accommodation duty to equate to unwarranted "micromanag[ing of] employment decisions." Principal Dissent at 13.

Furthermore, even where the Principal Dissent later eschews reliance on a purportedly narrow interpretation of adverse employment action (akin to the one adopted by the district court and the Panel Majority) and relies instead on its own conception of the import of the terms-conditions-and-privileges-of-employment language, the Principal Dissent's critique of the blind-law-clerk hypothetical misapprehends the extent of the accommodation duty that the ADA imposes on covered employers. The Principal Dissent proposes that the ADA's terms-conditions-and-privileges-of-employment language—or, as the Principal

(continued...)

33

Dissent would have it, the "in-regard-to clause"—requires a disabled individual to show (at the very least) that the employer's failure to accommodate her disability constructively altered the terms, conditions, or privileges of her employment and, in that connection, caused her more than de minimis harm. *See* Principal Dissent at 37 (noting that "the plaintiff can make out an ADA discrimination claim either by showing an express change or disparity in the terms or conditions of employment, or by showing a constructive change or disparity in those terms or conditions *based on pervasive hostility or discomfort* (emphasis added)); *id.* ("[W]here the failure to accommodate results in a constructive alteration in those terms or conditions [of employment], the employee can satisfy § 12112(a)'s in-regard-to clause."); *id.* at 39 ("In short, the discrimination must be in regard to the employment-related aspects covered by § 12112(a) *and* it must cause more than de minimis harm." (emphasis added)). But requiring disabled individuals to satisfy this showing—even if it could be "easily" done, *id.* at 43—would be improper and, more to the point, incompatible with the ADA's central purposes, as embodied in § 12112(b)(5)(A). As noted, the ADA is concerned with ensuring that disabled individuals can fully participate in society and enjoy equal opportunities in the workplace. And Congress has made the judgment that these purposes are not fully furthered by merely ensuring that employers cannot inflict non-de-minimis workplace injuries on disabled individuals; rather, these employers must provide such individuals with reasonable accommodations, so that they may "compete on an equal basis and . . . pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(8). Stated otherwise, the ADA is not simply concerned with shielding disabled individuals from significant workplace harms but also with reasonably accommodating the limitations of their disabilities so that they may "provide the Nation with the benefit of their consequently increased productivity." *Cleveland*, 526 U.S. at 801. To be sure, in the runup to its renewed critique of the blind-law-clerk hypothetical, the Principal Dissent suggests that it understands as much: *viz.*, that the ADA's objective is "to ensure an otherwise qualified individual with a disability is placed *on equal ground* with other employees in regard to the covered employment relationships." Principal Dissent at 40 (emphasis added). Yet, ultimately, the Principal Dissent loses its way when it concludes that the blind law clerk cannot make out a failure-to-accommodate claim under the ADA, unless—in addition to demonstrating that the judge failed to provide a reasonable accommodation—she also shows that the judge "constructively impacted [the]

(continued...)

Our reasoning here echoes that in *Smith*, where our court, sitting en banc, rejected the contention that the ADA's reassignment duty merely creates a right for employees to be *considered* for reasonable reassignments rather than creating a right to actually receive such reassignments. *See* 180 F.3d at 1164–70. In particular, we could not countenance a reading of the ADA that would make "empty" the "promise within the ADA" created when the statute listed reassignment as one of the specific "reasonable accommodations" in § 12111(9)(B). *Id.* at 1167. After all, we remarked, if an employer merely had to *consider* applications for reasonable reassignments, "[t]he employer could merely go through the meaningless process of consideration" for such applications and simply "refuse it in every instance." *Id.* And we observed that this "hollow promise" would offer "cold comfort for a disabled employee to know that his or her application was 'considered' but that he or she was nevertheless still out of a job." *Id.*

---

[8](...continued)
conditions of [her] employment." *Id.* at 41. By requiring the blind law clerk to make such a showing, the Principal Dissent diminishes the accommodation duty that the ADA imposes on the employer, while hindering the blind law clerk from competing on an equal basis with her fellow, non-visually-impaired clerks—thereby denying her the full enjoyment of the terms, conditions, and privileges of her employment.

We likewise cannot accept the proposition that the ADA—which by its plain terms affirmatively imposes on employers a reasonable-accommodation obligation, *see* 42 U.S.C. § 12112(a), (b)(5)(A)—should be construed in a manner that does not permit the statute to effectively ensure that *all* qualified disabled employees actually receive such an accommodation, but instead *only* such disabled employees that have *also* suffered an adverse employment action. Adopting such a construction of the statute would have the effect of significantly restricting the scope of the ADA's reasonable-accommodation obligation through the use of language (i.e., "adverse employment action") that does not even appear in the statute's text. The "promise" of equal opportunity and full participation that this reasonable-accommodation obligation provides qualified disabled individuals would be rendered substantially "hollow." *Smith*, 180 F.3d at 1167. We decline to construe the statute in a manner that would lead to this result.

**4**

Significantly, the understanding of the requisite elements of an ADA failure-to-accommodate claim found in our controlling precedents is consistent with the pronouncements of the EEOC, the federal agency charged with administering the statute. *See* 42 U.S.C. § 12116; 29 C.F.R. §§ 1630.1–.16; *see also* Brennan, *supra*, at 505 ("The EEOC's regulations and Interpretive Guidance

on the ADA also suggest an adverse employment action is not an element of a failure to accommodate claim.").

More specifically, the EEOC regulations implementing the ADA's protections state that "[i]t is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  29 C.F.R. § 1630.9(a).  This formulation of the statute's reasonable-accommodation requirement not only omits any mention of an adverse-employment-action component, but also implicitly rejects by this omission the notion that there is such a component in a failure-to-accommodate claim.  *See, e.g.*, ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 10, at 107 (2012) (discussing the operation of the "negative-implication canon").  Indeed, absent undue hardship, the regulation explains, a covered entity "unlawful[ly]" violates the ADA by not reasonably accommodating a disabled employee.  29 C.F.R. § 1630.9(a).  Full stop.  And, as this court has noted, the EEOC's "regulations to implement title I of the ADA . . . . are entitled to a great deal of deference."  *Smith*, 180 F.3d at 1165 n.5 (citations omitted); *see also US Airways*, 535 U.S. at 401, 403–04 (relying on EEOC regulations in applying Title I's provisions).

37

Similarly, the EEOC's interpretive guidance on the ADA and its enforcement guidance for ADA failure-to-accommodate claims—each of which we have referred to as "constitut[ing] a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *Smith*, 180 F.3d at 1165 n.5 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986))—omit any mention of an adverse-employment-action requirement for an ADA failure-to-accommodate claim. In particular, the EEOC's interpretive guidance on the ADA discusses at length "[t]he *obligation* to make reasonable accommodation" and how that obligation "applies to all services and programs provided in connection with employment." 29 C.F.R. pt. 1630, app. § 1630.9 (emphasis added). Nowhere, however, is there any suggestion in this interpretive guidance that this obligation is violated—thus creating liability under the ADA—only if the denial of a reasonable accommodation is in regard to some kind of adverse employment action constituting "a *significant change in employment status*," Aplt.'s App., Vol. II, at 449 (emphasis added), as the district court ruled, with the blessing of the Panel Majority.

As for the EEOC's enforcement guidance for failure-to-accommodate claims, it similarly notes that "[t]he duty to provide reasonable accommodation is a *fundamental statutory requirement*." U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC-CVG-2003-1, ENFORCEMENT GUIDANCE ON REASONABLE

38

ACCOMMODATION AND UNDUE HARDSHIP UNDER THE ADA (2002),

https://www.eeoc.gov/policy/docs/accommodation.html (emphasis added). That

document also states, under the heading of "Burdens of Proof," that "[o]nce the

plaintiff has shown that the accommodation s/he needs is 'reasonable,' the burden

shifts to the defendant/employer to provide case-specific evidence proving that

reasonable accommodation would cause an undue hardship in the particular

circumstances"; notably, it makes absolutely no mention of a need for the affected

employee to show an adverse employment action *before* the proof burden shifts to

the employer. *Id.* (citing *US Airways*, 535 U.S. at 401–02). Moreover, under the

heading of "Instructions for Investigators," the enforcement guidance presents an

extensive set of questions that investigators should inquire into while "assessing

whether [an employer] has violated the ADA by denying a reasonable

accommodation," *id.*; *see id.* (listing eleven primary bullet points and nineteen

subsidiary bullet points with detailed questions "investigators should consider,"

including questions relating to whether the employee requested a reasonable

accommodation, the purpose of the requested accommodation, and whether the

employer is claiming undue hardship); yet, there is a glaring absence of *any*

questions relating to an adverse employment action.

In sum, though not determinative, it is significant that the views of the

EEOC—that is, the federal agency charged with administering the ADA—

concerning the requisite elements of an ADA failure-to-accommodate claim, are in sync with our own, as found in our controlling case law. That is to say, the EEOC agrees with our precedential view that an adverse employment action is not a requisite element of a failure-to-accommodate claim.

**5**

If all of the foregoing were not enough, *none* of our sister circuits has regularly incorporated an adverse-employment-action requirement into an ADA failure-to-accommodate claim. *Cf.* 3C KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE & INSTRUCTIONS § 172:21, Westlaw (database updated Aug. 2020) (leading source of pattern jury instructions used by federal courts nationwide omitting an adverse employment action from the elements of an ADA failure-to-accommodate claim and providing that a plaintiff must establish that "Defendant failed to provide [*specify accommodations in dispute*] or any other reasonable accommodation" (brackets and italics in original)). More specifically, the overwhelming majority of the other circuits either have consistently declined to incorporate an adverse-employment-action requirement into an ADA failure-to-accommodate claim or have only incorporated such a requirement in name only because they have considered an employer's failure to accommodate to be a form of adverse employment action. *Cf.* Brennan, *supra*, at 507 (stating, while discussing the relevant approaches of both federal district and circuit courts, that

40

"[w]hen courts have been faced with the issue of whether an adverse employment action is needed to establish a prima facie failure to accommodate claim," "the majority" has concluded that it is "not" needed).  Though the decisions in the remaining circuits are not entirely uniform—that is, the decisions within these circuits (i.e., intra-circuit) do not all point in the same direction—the predominant view of these decisions does not support the incorporation of an adverse-employment-action requirement into an ADA failure-to-accommodate claim.  The critical point, however, bears restating: our research has not revealed even one circuit that has regularly incorporated an adverse-employment-action requirement into an ADA failure-to-accommodate claim.  Thus, if we were to do so, we would be standing alone.

To be more concrete, no less than six circuits—the First, Fourth, Fifth, Sixth, Eleventh, and the D.C. Circuit—either state, or strongly suggest, that there is no adverse-employment-action requirement in ADA failure-to-accommodate claims.  *See Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) ("With respect to his *disparate treatment* claim, . . . . [the plaintiff] must show (1) that he suffers from a disability or handicap, as defined by the ADA . . ., that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and finally that (3) [the employer] took an adverse employment action against him because of, in whole or in part, his

41

protected disability. As to his *reasonable accommodation* claim, [the plaintiff]

needs to show, in addition to the *first two prongs* set forth above, that [the

employer], despite knowing of his alleged disability, *did not reasonably

accommodate it*." (citation and footnote omitted) (emphases added))[9]; *Rhoads v.*

_____

[9]      In *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17 (1st Cir.
2011), the First Circuit concluded that the plaintiff's ADA failure-to-
accommodate claim could not succeed because she had not established that she
was a "qualified individual" under the ADA. *Id.* at 32. Immediately prior to
announcing this conclusion, the *Colón-Fontánez* court stated that

> [t]o establish a claim under the ADA, a plaintiff must prove three
> factors by a preponderance of the evidence: (1) she was disabled
> within the meaning of the ADA; (2) she was qualified to perform
> the essential functions of the job, either with or without
> reasonable accommodation; and (3) *the employer took an adverse
> employment action against her because of the alleged disability*.

*Id.* (emphasis added). As to whether an ADA failure-to-accommodate claim has
an adverse-employment-action requirement, we read *Colón-Fontánez*'s
articulation of the prima facie case for an ADA discrimination claim to be dictum
and not in meaningful conflict with the First Circuit's decision in *Carroll*. *Cf.*
BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT § 36, at 300 (2016)
(noting that "[a] court considering [ostensibly] discordant decisions must first
determine whether the perceived conflict between them is *real*" (emphasis
added)).

     Nothing in *Colón-Fontánez* turned on the contents of the third element of
its articulated prima facie case; the court simply concluded that the plaintiff did
not satisfy the second element because she was not a qualified individual with a
disability. *See id.* at 32 (stating, immediately following its general articulation of
the prima facie case for an ADA discrimination claim, that the plaintiff "failed to
establish the second element of an ADA claim, *i.e.*, show that she was a qualified
individual under the ADA" and adding that the court "limit[ed] [its] analysis to
this factor"). When the First Circuit was called upon to focus on the elements of

(continued...)

*FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (juxtaposing a wrongful-discharge claim with a failure-to-accommodate claim, which contains no adverse-employment-action element, but instead requires a plaintiff to demonstrate "that the [employer] refused to make such [reasonable] accommodations" (first alteration in original) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 90 F.3d 1, 6 (2d Cir. 1999))); *Dillard v. City of Austin*, 837 F.3d 557, 562 (5th Cir. 2016) ("*Apart from* any claim that an adverse employment action was motivated by the employee's disability, an employer's failure to reasonably accommodate a disabled employee may constitute a distinct violation of the [ADA]." (emphasis added))[10]; *LHC Grp.*, 773 F.3d at 703 n.6 (Fifth Circuit stating that "[a] failure-to-accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered

---

[9](...continued)
an ADA failure-to-accommodate claim in *Carroll*, it offered in express and no uncertain terms its view that, for failure-to-accommodate claims, the adverse-employment-action requirement that is applicable in disparate-treatment cases is swapped out for the requirement that the employer "despite knowing of [the plaintiff's] alleged disability, did not reasonably accommodate it." 294 F.3d at 237. Moreover, *Colón-Fontánez*'s sole direct citation for the general prima facie case it articulates is *Carroll*, which strongly suggests that *Colón-Fontánez* had no intention of staking out a position concerning the elements of an ADA failure-to-accommodate claim that was at odds with *Carroll*.

[10]    *See* PATTERN JURY INSTRUCTIONS (CIVIL CASES) FOR THE FIFTH CIRCUIT § 11.10, at 200–01, 207 (PATTERN JURY INSTRUCTION COMM. (CIVIL) OF THE FIFTH CIRCUIT DIST. JUDGES ASS'N, 2020) (lacking, as an element in the pattern jury instructions for an ADA failure-to-accommodate claim, an adverse employment action).

43

adverse employment action"); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 & n.2 (6th Cir. 2007) (distinguishing between "claims premised upon an employer's failure to offer a reasonable accommodation" and "claims premised upon an adverse employment decision"); *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (stating that, in order for an ADA discrimination claim "to succeed, plaintiff must prove . . . that defendants *either* refused to make a reasonable accommodation for his disability *or* made an adverse employment decision regarding him solely because of his disability" (emphases added)); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) ("An employer *unlawfully* discriminates against a qualified individual with a disability *when* the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." (emphases added) (quoting 42 U.S.C. § 12112(b)(5)(A)))[11]; *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (omitting an adverse-employment-action requirement from the prima facie case for a failure-to-accommodate claim under the ADA).[12]

---

[11]     *Accord* ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES) § 4.12, at 1 (COMM. ON PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT JUDICIAL COUNCIL, revised 2020) (omitting an adverse-employment-action element from the pattern jury instruction for a failure-to-accommodate claim under the ADA).

[12]     A prior case from the D.C. Circuit, *Marshall v. Federal Express*
(continued...)

44

Two other circuits—the Third and the Eighth—typically have purported to incorporate an adverse-employment-action requirement into their ADA failure-to-accommodate claims. *See, e.g.*, *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010). But they do so in name only—that is, in a manner that is essentially form, rather than substance. That is so because these circuits classify *a failure to*

_____

[12](...continued)
*Corp.*, 130 F.3d 1095 (D.C. Cir. 1997), stated that "[a]s the language of § 12112(a) makes clear, for discrimination (including denial of reasonable accommodation) to be actionable, it must occur *in regard to* some adverse personnel decision or other term or condition of employment." *Id.* at 1099. We do not read this language as suggesting, however, that an adverse employment action—as the district court here understood it, that is, one involving "a *significant change in employment status*," Aplt.'s App., Vol. II, at 449 (emphasis added)—is a requisite element of a failure-to-accommodate claim. Indeed, *Marshall* itself left little room for doubt on the matter: the panel there

> assume[d] without deciding that if working conditions inflict pain or hardship on a disabled employee, the employer fails to modify the condition upon the employee's demand, and the employee simply bears the conditions, this could amount to a denial of a reasonable accommodation, *despite there being no job loss, pay loss, transfer, demotion, denial of advancement, or other adverse personnel action*.

130 F.3d at 1099 (emphasis added). The *Marshall* panel would not have been able to make this assumption if—in stating that an ADA failure-to-accommodate claim must be "in regard to some adverse personnel decision or other term or condition of employment," *id.*—it was in fact expressing the view that the viability of such claims is conditioned on the presence of an adverse employment action, as the district court here understood it (i.e., a significant change in employment status).

*accommodate* as an adverse "action." *Colwell*, 602 F.3d at 504 ("Adverse employment decisions in [the ADA discrimination] context *include* refusing to make reasonable accommodations for a plaintiff's disabilities." (emphasis added) (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004), *abrogated in part by statute as recognized in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 188 n.30 (3d Cir. 2019))); *see Dick*, 826 F.3d at 1060 ("An employer is . . . liable for committing an adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation."); *see also* MODEL CIVIL JURY INSTRUCTIONS FOR THE DIST. COURTS OF THE THIRD CIRCUIT § 9.1.3, at 18 (COMM. ON MODEL CIVIL JURY INSTRUCTIONS WITHIN THE THIRD CIRCUIT, revised 2019) (omitting from the list of elements for an ADA failure-to-accommodate claim an "adverse employment action" or language of a similar sort and describing the employer's conduct triggering liability as a failure "to provide [specify the accommodation(s) in dispute in the case] or any other reasonable accommodation"); MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DIST. COURTS OF THE EIGHTH CIRCUIT § 9.42, at 9-28 (COMM. ON MODEL JURY INSTRUCTIONS FOR THE DIST. COURTS OF THE EIGHTH CIRCUIT 2020) (omitting express language referring to an adverse employment action and describing the event triggering liability for a failure-to-accommodate claim as "the defendant failed to provide (specify

46

accommodation(s) identified by the plaintiff) and failed to provide any other reasonable accommodation"); *cf.* Brennan, *supra*, at 511 (though recognizing that courts like the Third Circuit do *not* require plaintiffs to establish an adverse employment action *apart from* an employer's failure to provide a reasonable accommodation, expressing disapproval of this approach because it imports the disparate-treatment concept of an adverse employment action into the realm of a failure-to-accommodate claim, which "is like trying to fit a square peg into a round hole").[13]

Thus, though the Third Circuit and the Eighth Circuit typically have purported to include an adverse-employment-action requirement in their failure-to-accommodate claims, an employer's liability actually stems from no more than

---

[13] A panel of the Eighth Circuit has strayed from the path marked by other Eighth Circuit panels addressing ADA failure-to-accommodate claims. *See Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707 (8th Cir. 2003). There, the panel stated that, in pursuing a failure-to-accommodate claim, a plaintiff must demonstrate, *inter alia*, that she "suffered an adverse employment action as a result of the disability." *Id.* at 711 (quoting *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002)). And it relied on the Seventh Circuit's decision in *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029 (7th Cir. 1999), in support of this proposition. *See Fenney*, 327 F.3d at 716 & n.18. *Fenney* is unrepresentative of Eighth Circuit failure-to-accommodate cases, and it would be a problematic guide for us for at least two reasons. First, the *Duty* case from which *Fenney* quoted the elements of a prima facie case is not even a failure-to-accommodate case; instead, as classically befits a disparate-treatment claim, the plaintiff there alleged that his employer "terminated his employment, based on disability." *Duty*, 293 F.3d at 488. Further, as we explicate in this same subpart *infra*, *Foster* is at best dubious authority and seems to be an outlier in the Seventh Circuit.

the employer's failure to make a reasonable accommodation, which is deemed an adverse employment action. In sum, in these two circuits, there is no need for plaintiffs to demonstrate, in addition to the employer's failure to provide a reasonable accommodation, that they also suffered "a *significant change in employment status*." Aplt.'s App., Vol. II, at 449 (emphasis added). Accordingly, focusing on the substance and not the form, we find that these two circuits are virtually indistinguishable from those that do not have an adverse-employment-action requirement at all in their failure-to-accommodate claims.[14]

---

[14] In fact, a recent decision may suggest that the Eighth Circuit is effacing completely whatever nominal, thin line has typically separated its precedent from those circuits that have straightforwardly declined to incorporate an adverse-employment-action requirement into an ADA failure-to-accommodate claim. *See Garrison v. Dolgencorp, LLC*, 939 F.3d 937 (8th Cir. 2019). In *Garrison*, the Eighth Circuit panel elided any mention of an adverse-employment-action element in expressly setting forth the plaintiff's prima face case in a failure-to-accommodate claim; it required the plaintiff to show, as most relevant here, only that the employer "failed to engage in a 'flexible' and 'informal[] interactive process' with her about possible accommodations" and that "her disability could have been reasonably accommodated had the interactive process taken place." *Id.* at 941 (alteration in original) (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951–52 (8th Cir. 1999)). That, moreover, was not the end of the story. *Garrison* also expressly distinguished the plaintiff's ADA failure-to-accommodate claim from her other claims, including a state-law failure-to-accommodate claim, that required her to show that "she suffered an 'adverse employment action.'" *Id.* at 942 n.1 (quoting *Markham v. Wertin*, 861 F.3d 748, 756 (8th Cir. 2017)); *see id.* at 942 (distinguishing plaintiff's failure-to-accommodate claim from her others where a plaintiff "would need to prove that [the employer] took an adverse employment action against her"). Therefore, if *Garrison* is a bellwether of the Eighth Circuit's developing jurisprudence in the ADA failure-to-accommodate context, that circuit may be erasing the thin line

(continued...)

48

And while the decisions in the Seventh, Second, and Ninth Circuits are not entirely uniform, the predominant view of the decisions in these circuits does not support the incorporation of an adverse-employment-action requirement into an ADA failure-to-accommodate claim. More specifically, the Seventh Circuit has explicitly stated that "[n]o adverse employment action is required to prove a failure to accommodate." *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 638 n.1 (7th Cir. 2010); *see Timmons*, 469 F.3d at 1125 ("*In addition to* prohibiting adverse employment actions against disabled persons because of their disabilities, the ADA requires employers to make reasonable accommodations for the disabilities of qualified individuals." (emphasis added)); *see also Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015) (presenting the prima facie case for an ADA failure-to-accommodate claim without mention of an adverse-employment-action requirement); *accord* FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 4.03, at 89 (COMM. ON PATTERN CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, revised 2017) (omitting an adverse-employment-action element from pattern jury instructions for a failure-to-accommodate claim under the ADA).

---

[14](...continued)
that typically has separated its precedent—albeit only nominally—from those circuits that have straightforwardly declined to incorporate an adverse-employment-action requirement into an ADA failure-to-accommodate claim.

To be sure, in one decision from the late 1990s, the Seventh Circuit remarked that "to state a prima facie case of disability discrimination for failure to accommodate the disability, a plaintiff must demonstrate . . . that she was discharged because of her disability." *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1033 (7th Cir. 1999), *abrogation on other grounds recognized by Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962–63 (7th Cir. 2010). However, there is some reason to doubt whether *Foster* was actually articulating a prima facie case that is generally applicable in all ADA failure-to-accommodate cases, as opposed to just ones like *Foster* where the employee *did* suffer an adverse employment action. *See id.* at 1032 (noting that Ms. Foster "filed a charge of discrimination with the Illinois Department of Human Rights and the EEOC, alleging that she was suspended and discharged because of her disability"). In that regard, when initially describing the ADA failure-to-accommodate prima face case, *Foster* noted that the "prima facie case mirrors the statutory elements," quoting for support only the language of § 12112(b)(5)(A), *id.*, which does not include the term "adverse employment action." And, when *Foster* first stated the failure-to-accommodate prima face case, it tellingly described the showing that must be made by "a plaintiff who has suffered an adverse employment action." *Id.* In any event, even if we were willing to put these serious questions aside, and view *Foster* as supporting the general incorporation of an adverse-employment-

50

action requirement into an ADA failure-to-accommodate claim, it would be a thin reed indeed upon which to rest an argument for such a requirement: *Foster* cites no authority to support the purported incorporation of this element and, given the substantial body of Seventh Circuit authority to the contrary, *Foster* is seemingly an outlier.[15]

In a similar vein, what appears to be the predominant view of the Second Circuit is expressed in cases like *McMillan v. City of New York*, 711 F.3d 120 (2d Cir. 2013), where the court stated that, in addition to those ADA discrimination claims alleging that the employee "suffered adverse employment action because of his disability," *id.* at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)), "[a]n employer may *also* violate the ADA by failing to provide a reasonable accommodation," *id.* (emphasis added); *see id.* at 126 (repeating the distinction between "discrimination claims based . . . on adverse employment actions" and those based "on failures to accommodate"); *see also Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) ("In so-called reasonable-accommodation cases, such as this one, the plaintiff's burden 'requires a showing that (1) plaintiff is a person with a disability under the meaning of the

---

[15]    Indeed, as Ms. Exby-Stolley pointed out in oral argument, *see* Oral Arg. at 19:16–19:51, the author of *Foster* joined—as a panel member—over ten years later, the *AutoZone* decision, which expressly and clearly held that "[n]o adverse employment action is required to prove a failure to accommodate," *AutoZone*, 630 F.3d at 638 n.1.

ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004))). But the Second Circuit's decisions admittedly are not entirely uniform. Notably, in *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100 (2d Cir. 2001), the court suggested that ADA failure-to-accommodate claims require an adverse employment action. *See id.* at 107–08. Yet, the *Parker* panel cited *solely* the Seventh Circuit's *Foster* decision for this proposition, *see id.* at 108, and we have shown that *Foster* provides a questionable and weak foundation for it.

And, lastly, the story in the Ninth Circuit is similar. The predominant view gleaned from the cases there may be stated succinctly: an adverse employment action is not a requisite element of an ADA failure-to-accommodate claim. *See, e.g.*, *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." (quoting 42 U.S.C. § 12112(b)(5)(A))); *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017) ("recogniz[ing] that a failure-to-accommodate claim 'is

52

analytically distinct from a claim of disparate treatment or impact under the ADA,'" and noting that where "[the employer] was aware of or had reason to be aware of [the employee's] desire for a reasonable accommodation," "[s]uch awareness triggered [the employer's] duty to engage in the interactive process" with the aim of reaching a reasonable accommodation (citation omitted) (quoting *Johnson v. Bd. of Trs. of Boundary Cty. Sch. Dist.*, 666 F.3d 561, 567 (9th Cir. 2011))); *see also* MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DIST. COURTS OF THE NINTH CIRCUIT § 12.7, at 293 (NINTH CIRCUIT JURY INSTRUCTIONS COMM., revised 2020) (omitting an adverse employment action from the enumerated elements of an ADA failure-to-accommodate claim).

To be sure, the County relies on one Ninth Circuit decision that stands against this significant weight of intra-circuit authority. *See Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) ("To establish a prima facie case for failure to accommodate under the ADA, Samper must show that '(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability.'" (alterations in original) (quoting *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (per curiam))). But, as with the Seventh Circuit's *Foster* decision, *Samper* appears to be an outlier and certainly is not

representative of the Ninth Circuit's predominant view on the incorporation *vel non* of an adverse-employment-action element into a failure-to-accommodate claim. Under that predominant view, this element is not incorporated.

In sum, from this survey of the decisions of our sister circuits, the critical takeaway is this: *none* of our sister circuits has regularly incorporated an adverse-employment-action requirement into an ADA failure-to-accommodate claim. And, consequently, if we were to do so, we would be standing alone. Of course, we are free to do so, but we are reluctant to effectively create a circuit split (or at the very least something very closely akin to it), especially where so many circuits would be lined up against us. *See United States v. Thomas*, 939 F.3d 1121, 1130–31 (10th Cir. 2019) (noting that "[w]e should not create a circuit split merely because we think the contrary arguments are marginally better," and that "the greater the number of circuits that are aligned together, the more an appropriate judicial modesty should make us reluctant to reject that uniform judgment. Although Defendant's argument is hardly frivolous, we do not think it sufficiently persuasive to overcome that reluctance").

## C

Despite this virtual mountain of contrary legal authority and practice—in this and other circuits—the district court nevertheless instructed the jury here that an adverse employment action was a requisite element of an ADA failure-to-

54

accommodate claim. In so doing, the court effectively read the relevant statutory text as including language that it undisputedly does not—that is, the term "adverse employment action." As we noted early on, *see* Part II.A *supra*, this mode of statutory interpretation—which effectively adds words to the statute—is generally impermissible, and it is so here, *see, e.g.*, *Dean*, 556 U.S. at 572; *Pueblo of San Ildefonso*, 103 F.3d at 939. What we explain now is that, insofar as the district court, like the Panel Majority, believed that it was obligated to adopt such a reading of the statute in order to take into account the portion of the statute that provides that prohibited disability discrimination must be "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a),[16] the court was mistaken for at least two reasons.

First, the express incorporation of § 12112(a)'s terms-conditions-and-privileges-of-employment language into an ADA failure-to-accommodate claim is unnecessary because that claim necessarily implicates and provides particularized, concrete expression to that terms-conditions-and-privileges-of-employment language. In other words, to be actionable under Title I of the ADA, an

---

[16]    As we noted *supra*, *see* Part II.A, we frequently refer to the latter-quoted language, in short, as "the terms-conditions-and-privileges-of-employment language."

employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id*. § 12112(b)(5)(A), necessarily—indeed, as a matter of logic and common sense—must involve (i.e., be "in regard to") that qualified person's "terms, conditions, and privileges of employment," as specified in § 12112(a). Therefore, it is unnecessary for a court to expressly incorporate § 12112(a)'s terms-conditions-and-privileges-of-employment language into an ADA failure-to-accommodate claim to ensure that this language, in substance, is taken into account. And, second, the term "adverse employment action"—as used by the district court in its instructions and as understood in our precedent—is not synonymous with the statutory language "terms, conditions, and privileges of employment." Therefore, even if a court desired (without any obligation to do so) to expressly take into account the terms-conditions-and-privileges-of-employment language of § 12112(a) in an ADA failure-to-accommodate claim, it would be misguided and legally improper for it to use—in lieu of this language—the term "adverse employment action."

**1**

To explain why the express incorporation of § 12112(a)'s terms-conditions-and-privileges-of-employment language into an ADA failure-to-accommodate claim based on § 12112(b)(5)(A) is unnecessary, we must spend a few moments

56

shedding light on the structure and operation of the relevant statutory provisions.

*Cf. Hamer*, 924 F.3d at 1103–04 (noting, while interpreting portions of Title II of

the ADA, that "the text and structure . . . guide our decision": "[o]ur starting

point is the plain language of Title II," and, because "the meaning of statutory

language, plain or not, depends on context," "we may also look to the 'specific

context in which that language is used' and 'the broader context of the statute as a

whole'" (first quoting *First Nat'l Bank of Durango v. Woods (In re Woods)*, 743

F.3d 689, 694 (10th Cir. 2014), and then quoting *Salazar v. Butterball, LLC*, 644

F.3d 1130, 1137 (10th Cir. 2011))).

Recall that § 12112(a), entitled "General rule," provides the general,

employment-discrimination proscription of Title I of the ADA, stating the

following:

> No covered entity shall [1] discriminate against a qualified
> individual on the basis of disability [2] in regard to job
> application procedures, the hiring, advancement, or discharge of
> employees, employee compensation, job training, and other
> terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). As the inserted brackets evince, there are two salient

components to § 12112(a).[17] First, the statute defines in general terms the nature

of its protection: that is, the statute protects "a qualified individual" from being

---

[17] Though drawing the wrong conclusion from this point, the Panel
Majority seemed to recognize as much, too, because it reproduced the statutory
text with the two brackets inserted in the same places. *See* 906 F.3d at 907.

57

"discriminate[d] against . . . on the basis of a disability." *Id.* Second, the statute specifies what this protection is "in regard to": it protects "qualified" persons from disability discrimination "in regard to" employment-related matters, particularly all matters relating to "terms, conditions, and privileges of employment." *Id.* Stated otherwise, boiled down to its essence, § 12112(a)'s language defines, first, who is being protected from disability discrimination (i.e., "a qualified individual") and, second, what kind of disability discrimination the protected individual is being protected from (i.e., disability discrimination "in regard to . . . terms, conditions, and privileges of employment"). The "General rule" of § 12112(a) thus evinces these two salient components.

Subsection 12112(b), entitled "Construction," is inextricably intertwined with § 12112(a)'s "General rule." Critically, it particularizes and makes concrete the second component of this rule by offering in non-comprehensive fashion examples of the kinds of disability discrimination that are "in regard to . . . terms, conditions, and privileges of employment." *Id.* § 12112(a). Specifically, subsection (b) provides in pertinent part, the following:

> As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes--
>
> **(1)** limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

58

**(2)** participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

**(3)** utilizing standards, criteria, or methods of administration--

> **(A)** that have the effect of discrimination on the basis of disability; or

> **(B)** that perpetuate the discrimination of others who are subject to common administrative control;

**(4)** excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

**(5)(A)** *not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity*; or

**(B)** denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

**(6)** using qualification standards, employment tests or other selection criteria that screen out or tend to screen out

an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

**(7)** failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

*Id.* § 12112(b) (emphasis added). In other words, subsection (b) is inextricably intertwined with subsection (a)'s "General rule" because it underscores that a covered employer may not "discriminate against a qualified individual on the basis of disability," while at the same time particularizing and making concrete the second component of the "General rule" through examples of what prohibited disability discrimination in the employment context looks like—that is, what it means to discriminate against qualified individuals "in regard to . . . terms, conditions, and privileges of employment." *Id.* § 12112(a).

As to the second component, subsection (b)'s introductory clause, "As used in subsection (a)," clarifies that what follows in subsection (b) is not just some random list of ways that a covered employer may "discriminate against a qualified

individual on the basis of disability."[18]  Rather, subsection (b)'s enumerated

examples particularize and give concrete expression to areas of discriminatory

conduct against qualified individuals that are expressly referenced in

subsection (a).  Consequently, these examples necessarily implicate—i.e., are "in

regard to"—those individuals' "terms, conditions, and privileges of employment";

they are examples of discrimination "[a]s used in subsection (a)."  *Id.* § 12112(b).

The upshot of all of this is that § 12112(b) is inextricably intertwined with

the "General rule" of § 12112(a)—and, more specifically, the second component

of that rule—and all of the examples of subsection (b) necessarily implicate the

terms-conditions-and-privileges-of-employment language of subsection (a).  For

instance, one form of discrimination listed in § 12112(b) is "*limiting, segregating,*

*or classifying a job applicant or employee* in a way that adversely affects the

opportunities or status of such applicant or employee because of the disability of

such applicant or employee."  *Id.* § 12112(b)(1) (emphasis added).  This category

of discrimination necessarily implicates § 12112(a)'s terms-conditions-and-

privileges-of-employment language—that is, it necessarily is "in regard to . . .

---

[18]    The Panel Majority mistakenly viewed the examples in subsection (b) as in some sense distinct from the areas of discrimination specified in the second component of the "General rule."  *See* 906 F.3d at 907 ("What subparagraph (b)(5)(A) and the other provisions in subsection (b) do is to provide disabled persons with a cause of action even when they have not shown that the employer 'discriminate[d] against a qualified individual on the basis of disability,' *as otherwise required by § 12112(a)*." (alteration in original) (emphasis added)).

terms, conditions, and privileges of employment," and, more specifically, may relate to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, [or] job training." *Id.* § 12112(a). And another form of discrimination specified in subsection (b) is "*using qualification standards, employment tests or other selection criteria that screen out or tend to screen out* an individual with a disability or a class of individuals with disabilities," unless doing so is necessary for the specific job position at issue. *Id.* § 12112(b)(6) (emphasis added). This form of discrimination, too, is patently "in regard to . . . terms, conditions, and privileges of employment." *Id.* § 12112(a).

Importantly, a materially similar assessment can be made as to the form of discrimination at issue here—a failure to accommodate—which is embodied in § 12112(b)(5)(A). Though the effect may not be as obvious as where an employer affirmatively acts to limit or classify qualified disabled individuals "in a way that adversely affects the[ir] opportunities or status . . . because of the[ir] disability," *id.* § 12112(b)(1), an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A), where there is no "undue hardship" to the employer from doing so, is a form of disability discrimination that necessarily implicates the second component of § 12112(a)'s "General rule."

62

That is to say, it is a form of disability discrimination that necessarily is "in regard to . . . terms, conditions, and privileges of employment." *Id.* § 12112(a); *see id.* § 12111(9) ("The term 'reasonable accommodation' may include . . . (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, . . . and other similar accommodations for individuals with disabilities." (bolded text omitted)); *see also Lincoln*, 900 F.3d at 1205 ("[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the *essential functions of his job*." (alteration in original) (emphasis added) (quoting *Punt*, 862 F.3d at 1051)); 29 C.F.R § 1630.2(o) (defining "reasonable accommodation" as "[m]odifications or adjustments" concerning various terms, conditions, and privileges of employment, including those relating to the "job application process" and "the work environment").

With this statutory analysis in mind, it should be clear that a failure-to-accommodate claim predicated on § 12112(b)(5)(A) need not expressly incorporate the terms-conditions-and-privileges-of-employment language of § 12112(a)'s "General rule" (i.e., the second component of that rule) in order for

the failure-to-accommodate claim to adequately account in substance for that language. Put another way, even without expressly incorporating it as an element, § 12112(a)'s terms-conditions-and-privileges-of-employment language is, in substance, part and parcel of an ADA failure-to-accommodate claim.[19] Therefore, expressly incorporating that language into a failure-to-accommodate claim is unnecessary.[20] Accordingly, insofar as the district court's belief was to the contrary, it was mistaken.

---

[19] Thus, it should be patent from the foregoing analysis that, in predicating its position on the belief that we have somehow ignored the terms-conditions-and-privileges-of-employment language—what the Principal Dissent calls the "in-regard-to clause"—or rendered this language irrelevant to an ADA failure-to-accommodate claim, the Principal Dissent is fundamentally mistaken. *See, e.g.*, Principal Dissent at 1–5, 43-45. Suffice it to say that, properly understood, the statutory language that forms the basis for an ADA failure-to-accommodate claim, § 12112(b)(5)(A), is inextricably intertwined with and necessarily implicates the terms-conditions-and-privileges-of-employment language (i.e., the second component of § 12112(a)'s "General rule").

[20] To be clear, a district court—in belt-and-suspenders fashion—may permissibly instruct a jury that, in order for the plaintiff to prevail on an ADA failure-to-accommodate claim, the plaintiff must establish that the claim was in regard to the plaintiff's terms, conditions, or privileges of employment. In other words, we do not suggest that a court would err if it elected to include in its instructions a requirement that the employer's failure to accommodate must be "in regard to" the employee's terms, conditions, or privileges of employment. And we specifically discuss the proper meaning of the terms-conditions-and-privileges-of-employment language below. *See* Part II.C.2. But such an instruction is simply not necessary. And, for the reasons explicated below (i.e., Part II.C.2), it would be improper—in all events—for such an instruction to equate the terms-conditions-and-privileges-of-employment language with an adverse-employment-action requirement.

64

**2**

Furthermore, even if a district court were inclined (though not obliged) to expressly incorporate in some fashion § 12112(a)'s terms-conditions-and-privileges-of-employment language into its statement of an ADA failure-to-accommodate claim, it would be improper for the court to do so by equating the terms-conditions-and-privileges-of-employment language with the term "adverse employment action." The term "adverse employment action"—as the district court used it in its instructions and as we have used it in our precedent—is not synonymous with § 12112(a)'s terms-conditions-and-privileges-of-employment language. Therefore, incorporating the "adverse employment action" term into the ADA's failure-to-accommodate claim—as the court did here—would effectively involve adding language to the relevant statutory text that has no footing there—either expressly or in substance. Such addition-through-interpretation ordinarily is impermissible, and we see no reason it should not be so here. We now elaborate on these matters.

The district court instructed the jury here that, in order to rule in Ms. Exby-Stolley's favor, it needed to find an adverse employment action—that is, in the words of the instruction, that she "was discharged from employment or suffered another *adverse employment action*." Aplt.'s App., Vol. II, at 440 (emphasis added). The court defined the term "adverse employment action" as an action

65

"constitut[ing] *a significant change in employment status*, such a[s] hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 440, 449 (emphasis added). The Panel Majority embraced the district court's definition of an adverse employment action. *See, e.g.*, 906 F.3d at 902 (defining an "adverse employment action" as a "*materially adverse* decision" relating to those terms, conditions, and privileges (emphasis added)); *id.* at 918 (noting, in concluding that the County did not take an adverse employment action against Ms. Exby-Stolley, that the County "denied her [accommodation] request but . . . it did not fire her or make any other changes in her employment status"); *id.* at 917 (stating that the notion that *any* failure to reasonably accommodate constitutes an adverse employment action "has some appeal," as "[t]he typical failure-to-accommodate claim arises out of a failure to accommodate the employee . . . *and her consequent termination*," but ultimately rejecting this idea on the ground that "there could be a failure to accommodate that does not result in termination and is not otherwise connected to an adverse employment action" (emphasis added)).

And it is not surprising that the Panel Majority did so because the district court's understanding of an adverse employment action is congruent with our precedent. *See Annett*, 371 F.3d at 1237–38 ("An adverse employment action constitutes 'a significant change in employment status, such as hiring, firing,

66

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (quoting *Burlington Indus., Inc. v. Ellerth ("Ellerth")*, 524 U.S. 742, 761 (1998))); *see also Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012) ("An adverse employment action is a '*significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits.'" (final emphasis added) (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007))); *accord Hiatt*, 858 F.3d at 1316; *cf. Sanchez*, 164 F.3d at 532 (noting that "[t]he Tenth Circuit liberally defines the phrase 'adverse employment action,'" but underscoring that "we will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action" (quoting *Crady v. Liberty Nat'l Bank & Tr. Co.*, 993 F.2d 132, 136 (7th Cir. 1993))).

But this definition of "adverse employment action" is not synonymous with the definition of "terms, conditions, and privileges of employment language" found in controlling law. Take *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). There, the Court noted, in its discussion of Title VII's substantive anti-discrimination provision, that "[the words] 'hire,' 'discharge,' [and] 'compensation, terms, conditions, or privileges of employment' . . . limit the scope of that provision to actions that *affect* employment or *alter the conditions*

67

of the workplace." *Id.* at 62 (emphases added) (quoting 42 U.S.C. § 2000e-2(a)); *see also id.* at 64, 67 (stating that, by contrast, the reach of Title VII's anti-retaliation provision, which omits any such terms-conditions-and-privileges-of-employment language, "is not limited to discriminatory actions that affect the *terms and conditions of employment*," or, stated differently, the anti-retaliation provision extends to acts of retaliation that are not "*workplace-related* or *employment-related* retaliatory acts and harm" (emphases added)). In other words, in describing the import of the "terms, conditions, [and] privileges of employment" language in Title VII, the Court in *Burlington* emphasized that the presence or absence of this language helps to clarify whether the conduct covered under the provision must relate to the *employment* context.[21]

_____

[21] The Panel Majority stated that the Supreme Court in *Burlington* "made the connection between adverse employment action and the statutory terms-and-conditions-of-employment language." 906 F.3d at 907 n.2 (emphasis omitted). More specifically, the Panel Majority described *Burlington* as holding that Title VII retaliation claims do not require an adverse employment action since Title VII's anti-retaliation provision—unlike that statute's substantive, anti-discrimination provision—does not contain any language regarding the "terms, conditions, or privileges of employment." *See id.* We disagree with this reading of *Burlington*, which effectively equates an adverse employment action with the terms-conditions-and-privileges-of-employment language. As relevant here, that case simply held that, given the absence of terms-conditions-and-privileges-of-employment language in Title VII's anti-retaliation provision, actionable retaliation under Title VII is not limited to "*workplace-related* or *employment-related* retaliatory acts and harm." 548 U.S. at 67 (emphases added). That is, the Supreme Court in *Burlington* merely expressed the view that the inclusion of terms-conditions-and-privileges-of-employment language in a statutory provision

(continued...)

68

Moreover, the Supreme Court has noted that, though the inclusion of "terms, conditions, [and] privileges of employment" language in a statutory provision offers clarity on whether the provision only covers conduct relating to the employment context, it also signals that the provision at issue covers a wide range of conduct *within* the employment context. Specifically, in *Meritor Savings Bank, FSB v. Vinson*, the Court explained that the terms-conditions-and-privileges-of-employment language in Title VII serves to combat the "*entire spectrum*" of workplace discrimination:

> [Petitioner] contends . . . that in prohibiting discrimination with respect to "compensation, terms, conditions, or privileges" of employment, Congress [in enacting Title VII] was concerned with what petitioner describes as "tangible loss" of "an economic character," not "purely psychological aspects of the workplace environment." . . . We reject petitioner's view. . . . The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "'to strike at the *entire spectrum* of disparate treatment . . . '" in employment.

477 U.S. at 64 (emphases added) (quoting *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).

---

[21](...continued)
signals that the conduct the provision covers must "affect employment or alter the conditions of the workplace," and that the absence of such language suggests that the provision's covered conduct can transcend the workplace. *Id.* at 62. The Court said nothing about a connection between the terms-conditions-and-privileges-of-employment statutory language and an adverse-employment-action requirement, much less held that such a connection exists.

69

*Burlington* and *Meritor Savings Bank* thus provide us with a broad conception of the scope of the language "terms, conditions, [and] privileges of employment." Specifically, such language in a statutory provision ordinarily signals that the provision covers a *wide range* of *employment-related* conduct. And, though *Burlington* and *Meritor Savings Bank* commented on the "terms, conditions, [and] privileges of employment" language contained in Title VII, we discern nothing in the text of those decisions or otherwise that suggests their reasoning does not readily apply to nearly identical language in the ADA. *See, e.g.*, *Lanman v. Johnson County*, 393 F.3d 1151, 1155 (10th Cir. 2004) ("The ADA provides that no employer covered by the Act 'shall discriminate against a qualified individual with a disability . . . in regard to . . . *terms, conditions, and privileges of employment*.' Congress borrowed this language from Title VII . . . ." (second omission in original) (citation omitted) (quoting 42 U.S.C. § 12112(a))).

In this regard, the Supreme Court's interpretation of the "terms, conditions, [and] privileges" language in Title VII as evincing an intent to cover "the *entire spectrum*" of employment discrimination, *Meritor Sav. Bank*, 477 U.S. at 64 (emphasis added) (quoting *Manhart*, 435 U.S. at 707 n.13), was law a full five years before the 1991 passage of the ADA. "Thus, we can presume that Congress was aware of the Court's interpretation of 'terms, conditions, [and] privileges of

70

employment' when it chose to use parallel language in the ADA." *Lanman*, 393

F.3d at 1155 (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175–76 (4th Cir.

2001)).

Guided by the reasoning in *Burlington* and *Meritor Savings Bank*, we

believe that the ADA's language—"in regard to . . . [the] terms, conditions, and

privileges of employment," 42 U.S.C. § 12112(a)—signals that actionable

discrimination must "affect employment or alter the conditions of the workplace,"

*Burlington*, 548 U.S. at 62, i.e., that the discrimination must relate to some aspect

of employment, and also that the ADA's discrimination proscription reaches "the

*entire spectrum*" of employment-based disability discrimination, *Meritor Sav.*

*Bank*, 477 U.S. at 64 (emphasis added) (quoting *Manhart*, 435 U.S. at 707 n.13).

As a consequence of this reasoning, we are simply unwilling to equate

language that correctly signals the expansive sweep of the ADA's employment-

related, anti-discrimination mandate—i.e., the terms-conditions-and-privileges-of-

employment language—with language—i.e., "adverse employment action"—that

indicates that the discrimination proscription does not extend to circumstances

where there is no "*significant change in employment status*." Aplt.'s App., Vol.

II, at 440, 449 (emphasis added); *see* En Banc Br. for U.S. Amicus Curiae

("Gov't's Br.") at 9 ("But the 'adverse employment action' standard, as defined

by the district court, is inconsistent with that plain text. Congress did not limit

71

the statutory phrase 'terms, conditions, and privileges of employment' to economic harm or significant changes in employment status.").

To be sure, we recognize that the Panel Majority posited that we should feel comfortable treating "adverse employment action" as a "shorthand" for § 12112(a)'s terms-conditions-and-privileges-of-employment language because it has served this function in the Title VII context. 906 F.3d at 908. However, our preceding analysis of *Burlington* and *Meritor Savings Bank*—both Title VII cases—belies the suggestion that the latter language (i.e., "terms, conditions, and privileges of employment") should be restricted in the manner that our circuit's understanding of "adverse employment action" would require—that is, restricted to circumstances where the discrimination involves "a *significant change in employment status*." Aplt.'s App., Vol. II, at 440, 449 (emphasis added); *accord Hiatt*, 858 F.3d at 1316.[22] Therefore, we reject the suggestion that "adverse

---

[22] Counsel for the Department of Justice's Civil Rights Division, appearing as an amicus curiae, hypothesized that the Panel Majority's "shorthand" theory—i.e., its view that "adverse employment action" is judicial shorthand for § 12112(a)'s terms-conditions-and-privileges-of-employment language—"*could be* accurate if courts truly treated 'adverse employment action' as synonymous with the statutory language." Gov't's Br. at 17 (emphasis added). Yet, in virtually the same breath, the Department's counsel acknowledged that "many courts, *including the district court here*, construe 'adverse employment action' far more narrowly than actions that pertain to the 'terms, conditions, and privileges of employment.'" *Id.* at 17–18 (emphasis added). In particular, the district court here interpreted the term "adverse employment action" to mean "a *significant change in employment status*." Aplt.'s App., Vol. II, at 440, 449 (emphasis

(continued...)

72

employment action" could properly function as a shorthand for § 12112(a)'s terms-conditions-and-privileges-of-employment language.[23]

[22](...continued)
added).  As noted, this interpretation not only is consistent with our precedent, *see, e.g.*, *Annett*, 371 F.3d at 1237–38, but it also was embraced by the Panel Majority, *see, e.g.*, 906 F.3d at 902 (defining an "adverse employment action" as a "*materially adverse* decision" relating to those terms, conditions, and privileges (emphasis added)).  The upshot is that the hypothetical circumstances that the Department's counsel posited under which the Panel Majority's shorthand theory "could be accurate," Gov't's Br. at 17, are not present here.

[23]    The Panel Majority's opposing assertion in this regard rested on a weak foundation of out-of-circuit authority.  For example, contrary to the Panel Majority's suggestion, the Eighth Circuit in *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624 (8th Cir. 2016), did not examine the meaning of the terms-conditions-and-privileges-of-employment language at all, but instead predicated its analysis on the district court's and plaintiff's agreement that the ADA disparate-treatment and failure-to-accommodate claims at issue could be *conflated and addressed as one claim*.  *See id.* at 631 & n.4 ("Kelleher included her disability discrimination claim and her 'failure to continue to accommodate' claim as Counts 1 and 2, respectively, in her first amended complaint, but the district court addressed those claims as a single failure to accommodate claim.  On appeal, Kelleher also *treats them as a single claim, and we will do the same*." (emphasis added)).  However, as we have discussed, *see* Part II.B.2 *supra*, such an agreement regarding the conflation of the two claims was misguided because these claims have distinct elements; in particular, the disparate-treatment claim has an adverse-employment-action requirement and the failure-to-accommodate claim does not.  The Panel Majority also cited for support the D.C. Circuit's decision in *Marshall v. Federal Express Corp.*  It is true that there the court did make an observation seemingly helpful to the Panel Majority's position: "As the language of § 12112(a) makes clear, for discrimination (including denial of reasonable accommodation) to be actionable, it must occur *in regard to* some adverse personnel decision or other term or condition of employment."  130 F.3d at 1099.  But the court made this observation without citation to further authority or without even offering further analysis, and it did so—*not* in the context of resolving the merits of an ADA failure-to-accommodate claim—but, rather, in connection with rendering a holding regarding administrative exhaustion;

(continued...)

Thus, insofar as the district court sought to effect this equivalency between § 12112(a)'s terms-conditions-and-privileges-of-employment language and the term "adverse employment action"—as the district court and our case law have defined it—it committed legal error. More specifically, to the extent that the district court's mistaken belief about an ostensible obligation to expressly take into account § 12112(a)'s terms-conditions-and-privileges-of-employment language in an ADA failure-to-accommodate claim led the court—like the Panel Majority—to incorporate an adverse-employment-action requirement into that claim, the court committed legal error. And, to be clear, this is error irrespective of whether the district court was operating under such a mistaken belief: § 12112(a)'s terms-conditions-and-privileges-of-employment language is not synonymous with the term "adverse employment action," and therefore (whatever

---

[23](...continued)
therefore, the language is likely dictum in any event. *See id.* at 1098–99; *see also supra* note 12 (suggesting further reasons for rejecting the idea that this case supports the contention that "adverse employment action" functions as a shorthand for § 12112(a)'s terms-conditions-and-privileges-of-employment language). Moreover, it bears emphasis that—even if these snippets of language from *Kelleher* and *Marshall* lent any meaningful support to the "shorthand" theory that the Panel Majority advances (which is doubtful)—at the end of the day, as we discussed in Part II.B.5 *supra*, the Eighth Circuit and the D.C. Circuit (i.e., the courts issuing *Kelleher* and *Marshall*, respectively) have not held that an adverse employment action—at least in substance—is a requisite element of an ADA failure-to-accommodate claim. Therefore, for these reasons too, the Panel Majority's "shorthand" theory is unpersuasive, and we reject it.

74

its rationale) the district court erred by effectively adding language to the statutory text that has no footing there—either expressly or in substance.

*\*\**

In sum, we reject the view that an adverse employment action is a requisite element of an ADA failure-to-accommodate claim. Not only does the term "adverse employment action" not appear in the plain text of the relevant statutory provisions, but incorporating this element into an ADA failure-to-accommodate claim would be contrary to (1) our controlling precedent; (2) the inherent nature of a failure-to-accommodate claim, as contrasted with a disparate-treatment claim; (3) the general remedial purposes of the ADA; (4) the EEOC's understanding of the elements of an ADA failure-to-accommodate claim; and (5) the regularly followed practices of all of our sister circuits. Accordingly, the district court erred in incorporating an adverse-employment-action requirement into its instructions to the jury concerning Ms. Exby-Stolley's ADA failure-to-accommodate claim. In doing so, the district court did not "correctly state[] the governing law." *Woolman*, 913 F.3d at 992 (quoting *Martinez*, 572 F.3d at 1132).

III

Under the circumstances here, the district court's instructional error constrains us to reverse its judgment. Specifically, where "the district court has given a legally erroneous jury instruction, the judgment must be reversed if the

75

jury might have based its verdict on the erroneously given instruction." *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1079 (10th Cir. 2010) (quoting *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1158 (10th Cir. 2008)). And this "'might have' threshold, as its language suggests, requires reversal 'even if that possibility [of the jury basing its verdict on the erroneous instruction] is very unlikely.'" *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1159 (10th Cir. 2012) (quoting *Level 3 Commc'ns*, 535 F.3d at 1158); *accord Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 827 (10th Cir. 2019) ("We . . . must reverse based on an erroneous instruction if there is even a slight possibility of an effect on the verdict.").

Here, based on the record, we conclude with little difficulty that we must reverse: the jury returned a verdict for the County after expressly indicating on the Verdict Form that Ms. Exby-Stolley had failed to prove that she was either "discharged from employment," "not promoted," or subjected to any "other adverse action" by the County. Aplt.'s App., Vol. II, at 419. Therefore, there is much more than "a slight possibility" here that the jury based its verdict on the faulty instruction regarding an adverse employment action. We must reverse.

**IV**

Because our reversal of the district court's judgment will result in remand for a new trial, we pause in closing to address a purely legal issue that Ms. Exby-

Stolley presented in a contention of error on appeal and that is likely to recur on retrial. "[W]e think it proper for us to decide this issue for the guidance of the district court on remand." *Colo. Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 876 (10th Cir. 2005). Specifically, Ms. Exby-Stolley argued that "the district court improperly failed to instruct the jury that undue hardship is an affirmative defense and that the burden of persuasion lies with the County." 906 F.3d at 919. The Panel Majority held that any error by the district court regarding this matter would have been harmless because there was "no need for the jury to address the issue of undue hardship once it found that there was no adverse employment action." *Id.* More specifically, the Panel Majority opined that "[o]ur review of [this] issue would be required only if we had agreed with [Ms. Exby-Stolley's] failure-to-accommodate argument." *Id.* Because we do agree in this en banc proceeding with Ms. Exby-Stolley's failure-to-accommodate argument and because the undue-hardship issue presents a pure legal question that is likely to arise again on remand, we address it here for the guidance of the district court.[24]

---

[24] Ms. Exby-Stolley has maintained that the County waived the right to assert the undue-hardship defense by failing to raise the defense in its answer and—more significantly—in the pretrial order. Even assuming that the County failed to properly raise the defense in these documents, though the district court may well have had the discretion to exclude the issue of undue hardship from trial, *see, e.g.*, *Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir. 1995), it would not

(continued...)

[24](...continued) have been required to do so. *See MacCuish v. United States*, 844 F.2d 733, 736 (10th Cir. 1988) ("When there exists a 'properly drawn, detailed pretrial order, a trial court's determination that certain facts or issues must [or should not] be excluded from trial on the basis of a pretrial order may be reversed only if there is an abuse of discretion.'" (quoting *Smith v. Ford Motor Co.*, 626 F.2d 784, 795 (10th Cir. 1980))). In a proper exercise of its discretion, the district court still could permissibly instruct the jury at trial concerning the issue of undue hardship, absent a showing of (among other things) surprise or prejudice by Ms. Exby-Stolley. *See Smith*, 626 F.2d at 797 (noting that among the factors we should consider in determining whether the district court abused its discretion concerning the exclusion *vel non* of evidence not included in the pretrial order are "the prejudice or surprise in fact of the party against" whom the omitted matter is introduced (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977), *abrogated on other grounds as recognized by Goodman v. Lukens Steel Co.*, 777 F.2d 113, 120 (3d Cir. 1985))); *accord Cannon Oil & Gas Well Serv., Inc. v. Evertson*, 836 F.2d 1252, 1256 (10th Cir. 1987); *cf. Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1411 (10th Cir. 1988) ("Our cases show that when a party requests a new trial on the basis of surprise testimony it must be able to show surprise, prejudice, and an attempt to cure the prejudice such as a motion for a continuance."). And, based on our reading of the record, we discern no basis for such a showing of surprise or prejudice. For example, in its motion for summary judgment, the County argued that Ms. Exby-Stolley's "proposed accommodations would place an undue hardship on the [County]." Aplt.'s App., Vol. I, at 63–64 (Def.'s Mot. for Summ. J., filed May 28, 2014). And Ms. Exby-Stolley responded to that argument in her opposition to the motion for summary judgment. *Id.* at 81, 89, 97 (Pl.'s Resp. to Def.'s Mot. for Summ. J., filed June 25, 2014). Based on the district court briefing then, Ms. Exby-Stolley cannot reasonably claim that she was surprised or prejudiced when the County requested a jury instruction on an undue-hardship defense. *Cf. McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (holding that the plaintiff's claim was properly presented, even though first raised in response to a motion for summary judgment, because the defendant did not suffer prejudice). Indeed, though vigorously challenging on appeal the specific language of the district court's instructions relating to the issue of undue hardship, Ms. Exby-Stolley has not expressly claimed that she was surprised or prejudiced by the presence of the issue in the case. Therefore, irrespective of the County's assumed failure to raise

(continued...)

78

At trial, over Ms. Exby-Stolley's objection, the district court refused to instruct the jury that the County bore the burden of proof on an undue-hardship defense. The district court reasoned that it did not "believe" that undue hardship "is, in fact, an affirmative defense at trial." Aplt.'s App., Vol. V, at 1189–90; *see id.* at 1185 (noting, as to undue hardship, "I don't think this is an affirmative defense"). The ADA, however, clearly states that the employer—to avoid liability on a failure-to-accommodate claim—must "demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A); *see US Airways*, 535 U.S. at 396 ("[T]he ADA says that 'discrimination' includes an employer's 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business.'" (alterations and omissions in original) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A))). Our precedents are in accord. *See Punt*, 862 F.3d at 1050 (listing undue hardship as an affirmative defense available to the employer); *accord Smith*, 180 F.3d at 1179; *cf. Hwang v. Kan.*

_____

[24](...continued)
the undue-hardship defense in its answer or in the pretrial order, the district court did not abuse its discretion in instructing the jury concerning the issue of undue hardship. However, we are constrained to conclude *infra* that the district court erred in how it instructed the jury concerning the matter.

*State Univ.*, 753 F.3d 1159, 1162–63 (10th Cir. 2014) (addressing the employer's defensive undue-hardship burden under essentially coterminous substantive standards of the Rehabilitation Act). In short, undue hardship is an affirmative defense, and, consequently, the County bears the burden to establish it at trial. On remand, the district court should instruct the jury accordingly.

**V**

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for a new trial consistent with this opinion.

16-1412, *Exby-Stolley v. Board of County Commissioners*

**McHUGH**, Circuit Judge, dissenting, joined by **Tymkovich**, Chief Judge, and **Kelly**, **Eid**, and **Carson**, Circuit Judges; **Hartz**, Circuit Judge, also joins except as to section III.B.

Because I am unwilling to ignore twenty-five words Congress placed in the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–17, I cannot join the majority opinion. And because the jury instructions in this case are consistent with the plain meaning of those twenty-five words as applied to the allegations advanced by Ms. Exby-Stolley, I respectfully dissent.

To explain my reasoning, I proceed in four parts. First, I examine 42 U.S.C. § 12112(a) of the ADA, as modified by § 12112(b). I conclude that § 12112(b) defines only one of the two express requirements of § 12112(a). Second, I consider the reasons advanced by the majority for ignoring the second requirement of § 12112(a). Third, I address Ms. Exby-Stolley's burden in proving the remaining requirement of § 12112(a). In doing so, I look for guidance to the decisions interpreting an analogous provision found in Title VII of the Civil Rights Act of 1964 ("Title VII"). And finally, in the fourth section, I review the jury instructions to assess whether they correctly framed the elements of Ms. Exby-Stolley's claim. Concluding that they did, I would affirm the decision of the district court.

## I. REQUIREMENTS OF § 12112

The issue before this court is the proper interpretation of Title I of the ADA with respect to the requirements for proving a failure-to-accommodate claim. "In statutory construction, we begin 'with the language of the statute.'" *Kingdomware Techs., Inc. v.*

*United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Barnhart v. Sigmon Coal Co.*, 534

U.S. 438, 450 (2002)). Title I of the ADA sets out one blanket prohibition: "No covered

entity shall discriminate against a qualified individual on the basis of disability in regard

to job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). Broken down, a covered entity (that is, an employer

subject to the ADA) violates § 12112(a) when two conditions are met: (1) the employer

"discriminate[s] against a qualified individual on the basis of disability" (the

discrimination clause) and (2) the discrimination is "in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation,

job training, [or] other terms, conditions, and privileges of employment" (the in-regard-to

clause). *Id.*[1]

---

[1] For clarity, I will refer to the first requirement as the "discrimination clause" and the second requirement as the "in-regard-to clause." The "in-regard-to clause" is referenced by the majority as the "terms-conditions-and-privileges-of-employment clause." I use different nomenclature to distinguish the "in-regard-to clause" of the ADA from the "with-regard-to" clause of Title VII, because both include the "terms-conditions-and-privileges-of-employment" language.

Technically, there is a third clause that requires proving the discriminator is a covered entity under the ADA. The parties stipulated that the County regularly employed more than fifteen employees, thereby satisfying the definition of covered entity. *See* 42 U.S.C. § 12111(2), (5).

2

"In the ADA Congress provided not just a general prohibition on discrimination 'because of [an individual's] disability,'[2] but also seven paragraphs of detailed description of the practices that would constitute the prohibited discrimination." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013) (first alteration in original) (quoting 42 U.S.C. § 12112). In § 12112(b), Congress furnished the following "[c]onstruction" of § 12112(a): "As used in subsection (a), the term 'discriminate against a qualified individual on the basis of disability' includes" seven specified practices.

Here, Ms. Exby-Stolley alleges discrimination based on one of those specified practices: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]" (failure to accommodate). *Id.* § 12112(b)(5)(A). According to the majority, establishing discrimination under § 12112(b)(5)(A) is enough, standing alone, to satisfy Ms. Exby-Stolley's burden under § 12112(a). I disagree.

To be sure, § 12112(b) provides that a failure to accommodate satisfies the discrimination clause of § 12112(a). But in my view, it does nothing to excuse Ms. Exby-Stolley from the second requirement of § 12112(a)—the in-regard-to clause. Given that § 12112(b) identifies employment practices that violate § 12112(a)'s

---

[2] In 2009, the language of 42 U.S.C. § 12112(a) was amended by replacing "with a disability because of the disability of such individual" with "on the basis of disability." ADA Amendments Act of 2008, Pub. L. No. 110–325, § 5(a)(1), 122 Stat. 3553 (2008).

3

prohibition against "discriminat[ing] against a qualified individual on the basis of disability," the proper reading of § 12112(a) as applied to the present facts is: "No [employer] shall [fail to accommodate] in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). By its plain terms, § 12112(b) speaks directly to satisfaction of the discrimination clause but is silent as to the twenty-five words Congress included in the in-regard-to clause. In my view, then, the in-regard-to clause must be satisfied by something more than an employer's failure to accommodate.

The ADA Amendments Act of 2008 ("ADAAA") bolsters my conclusion that the in-regard-to clause is a separate requirement that must be satisfied even when showing discrimination under § 12112(b)(5)(A). Before the ADAAA, § 12112(a) made it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a) (2006). And subsection (b) provided, "[a]s used in subsection (a) of this section, the term 'discriminate' includes" the seven enumerated practices. The ADAAA struck the language "with a disability because of the disability of such individual" from § 12112(a) and replaced it with "on the basis of disability." ADA Amendments Act of 2008, Pub. L. No. 110–325, § 5(a)(1), 122 Stat. 3553 (2008). And Congress replaced "discriminate" in subsection (b) with "discriminate against a qualified individual on the basis of disability." *Id.* § 5(a)(2). Simply put, in 2008, Congress intentionally expanded the portion of subsection (a) satisfied by the acts listed in subsection (b) from "discriminate" to "discriminate against a qualified individual

4

on the basis of disability." But Congress did not expand subsection (b) to satisfy the entirety of subsection (a), including the in-regard-to clause. Congress's deliberate choice to expand subsection (b) to cover more, but not all, of the requirements imposed under subsection (a), emphasizes that the actions in subsection (b) do not satisfy the in-regard-to clause.

By ignoring the in-regard-to language, the majority violates the surplusage canon of statutory construction, which provides: "If possible, every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 26, at 174 (2012) ("A. Scalia & B. Garner"). Congress could have, but did not, eliminate the in-regard-to clause for failure to accommodate claims. Consequently, I would not read that language out of the statute. *See id.* ("The surplusage canon holds that it is no more the court's function to revise by subtraction than by addition."). Instead, I approach § 12112(a) with the goal of arriving at a construction that gives meaning to both the discrimination clause and the in-regard-to clause.

Before explaining my construction of the in-regard-to clause, I first respond to the reasons provided by the majority for assigning no meaning to that requirement. To be sure, the majority provides a thorough defense of its position. In my view, however, it offers no rationale that grants us permission to rewrite § 12112(a).

5

## II. RESPONSE TO THE MAJORITY

Despite the plain statutory construction that leaves the in-regard-to clause in place for failure-to-accommodate claims, the majority holds we can ignore these twenty-five words adopted by Congress for five reasons. First, the majority contends that our controlling precedent excuses plaintiffs advancing a failure-to-accommodate claim from establishing that such failure was "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Second, the majority concludes the absence of the in-regard-to requirement is apparent from the inherent differences between disparate-treatment and failure-to-accommodate claims. Third, the majority reasons that inclusion of such a requirement would be contrary to the general remedial purposes of the ADA. Fourth, the majority is convinced that the Equal Employment Opportunity Commission ("EEOC"), the agency responsible for administering the ADA, does not require failure-to-accommodate claimants to satisfy the in-regard-to requirement. And, finally, the majority is persuaded by the weight of authority from our sister circuits. I address each of these arguments in turn.

### A. *Existing Precedent*

According to the majority, our prior decisions have held that a plaintiff need not meet the requirements of the in-regard-to clause in a failure-to-accommodate case. *See* Maj. Op., Part II.B.1. Although I agree we have issued decisions that do not list satisfaction of the in-regard-to clause as an element of such a claim, this is the first time the issue has been placed squarely before this court. As the panel majority noted, "not a

6

single published opinion has even mentioned that the question was raised by a party, nor is there a single published opinion in which the answer to the question would have affected the outcome of the appeal." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 906 F.3d 900, 911 (10th Cir. 2018). And because the court sitting en banc is not bound by any of these panel decisions, I do not further elaborate on the persuasive analysis by the panel majority in support of its position that our prior panel decisions provide only dicta on this issue. *See id.* at 911–13.[3]

The decisions we *are* bound by do not resolve this issue. The Supreme Court has addressed an ADA failure-to-accommodate claim in only one case: *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002). But because there was no question that the failure to accommodate the plaintiff in *U.S. Airways* resulted in an adverse employment action—termination—the Court had no occasion to consider the application of the in-regard-to clause. As a result, *U.S. Airways* does not speak to the issue before us.

In the only failure-to-accommodate case this court has previously considered en banc, we accurately listed the elements of the claim to include a prong designed to satisfy the in-regard-to clause. In *Smith v. Midland Brake, Inc.*, we were faced with the following question: "if a person is a 'qualified individual with a disability' and a

---

[3] In this regard, I also note that while the majority relies heavily on dicta from our past cases to help establish its position, *see* Maj. Op., Part II.B.1, it subsequently rejects similarly situated statements in extra-circuit authority that cut against its position, *see id.* at 40 n.9 (deeming a First Circuit opinion's "articulation of the prima facie case for an ADA discrimination claim to be dictum," because "[n]othing in [the opinion] turned on the contents of the third element of its articulated prima facie case").

7

reasonable accommodation is not available to enable that employee to perform the

essential functions of his or her existing job, what is the scope of the employer's

obligation to offer that employee a reassignment job?" 180 F.3d 1154, 1159 (10th Cir.

1999) (en banc). In answering this question, the en banc court determined that

> [t]he unvarnished obligation derived from the statute is this: an employer *discriminates* against a qualified individual with a disability if the employer fails to offer a reasonable accommodation. If no reasonable accommodation can keep the employee in his or her existing job, then the reasonable accommodation may require reassignment to a vacant position so long as the employee is qualified for the job and it does not impose an undue burden on the employer.

*Id.* at 1169.

We then set out the elements of a prima facie case of failure-to-accommodate,

explaining the employee must show

> (1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer;
> (2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished[;]
> (3) The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;
> (4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and
> (5) The employee *suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position*.

*Id.* at 1179 (emphasis added). The plaintiff is also required to prove each of these five

8

elements at trial. *Id.* Importantly, we recognized that the failure to reassign was not enough, standing alone, to make out the claim. Instead, the employee must also show injury as a result of that failure.

The majority's reliance on other decisions from this court to argue we have endorsed a prima facie case for failure to accommodate that does not include an injury "in regard to" employment—often referred to as an adverse employment action—is also unpersuasive for another reason. In setting forth a prima facie claim for standard disability discrimination, we have often failed to expressly include an adverse employment action as an element. *See, e.g.*, *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037–38 (10th Cir. 2011) ("[I]n order to establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that he (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." (internal quotation marks omitted)); *see also Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018); *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1308 (10th Cir. 2017); *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015); *Koessel v. Sublette Cnty. Sherriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013); *Butler v. City of Prairie Vill.*, 172 F.3d 736, 748 (10th Cir. 1999); *but see Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001) (listing the third element as "suffered adverse employment action because of the disability"). Yet, the reasoning of those decisions makes clear that an

9

adverse employment action is an element of such claims. *See, e.g.*, *C.R. Eng.*, 644 F.3d at 1038 & n.10; *Lincoln*, 900 F.3d at 1192–93; *Butler*, 172 F.3d at 748.

In any event, because we are sitting en banc, we are free to interpret the ADA anew, giving appropriate meaning to the words used by Congress.

**B.** *Inherent Nature of a Failure-to-Accommodate Claim*

According to the majority, failure-to-accommodate claims should be construed differently than the other six types of discrimination identified by Congress in 42 U.S.C. § 12112(b) because the other types of discrimination claims target actions, while failure-to-accommodate claims focus on the failure to act. *See* Maj. Op., Part II.B.2. While that may be an accurate observation, I fail to see why it excuses us from applying the statute according to its plain language. Nor do I agree that "it would verge on the illogical to require failure-to-accommodate plaintiffs to establish that their employer *acted* adversely toward them—when the fundamental nature of the claim is that the employer *failed to act*." *Id*. at 23. Indeed, the best indication of what Congress intended "is the statutory text adopted by both Houses of Congress and submitted to the President." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).

Section 12112(a)'s second element does not require a plaintiff to establish that the employer *acted* adversely toward the plaintiff. Rather, it requires that the failure to accommodate be "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). That is, the failure to accommodate must have had some negative impact on hiring, promotion, firing,

10

compensation, training, or, more expansively, "other terms, conditions, and privileges of employment." Nothing about this language requires the plaintiff to prove that the employer took some affirmative action, in addition to the failure to accommodate. But the failure to accommodate is actionable only if it is "in regard to" the "terms, conditions, and privileges of employment." Thus, in my view, the majority's distinction between action and failure to act is a straw man that does not advance the statutory analysis.

Likewise, the absence of a discriminatory intent requirement in failure-to-accommodate claims says nothing about the need to show a connection between the failure and the terms, conditions, and privileges of employment. Congress did not intend to create a "super" human resources department to dictate employer conduct irrespective of its impact. *Cf. Jones v. Barnhart,* 349 F.3d 1260, 1267 (10th Cir. 2003) ("Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." (quotation marks omitted) (interpreting Title VII)). Rather, the ADA gives disabled employees a remedy for actual harm incurred in employment. Thus, even where the employer's failure to make a reasonable accommodation was not intentionally discriminatory, the ADA protects an employee whose conditions of employment are nonetheless impacted as a result. And in most instances, it should be a small burden for the plaintiff to meet this requirement. Where the failure to accommodate results in termination, demotion, reduced compensation, the loss of an opportunity for promotion, or another detrimental impact on the terms or conditions of employment, the second requirement is easily met.

11

The majority advances sound reasons why Congress might have decided to excuse plaintiffs bringing failure-to-accommodate claims from satisfying the in-regard-to clause. But the plain language of the statute indicates Congress declined to do so. Instead, as with all other discrimination claims under the ADA, failure-to-accommodate claims include a requirement that the failure be in regard to the terms, conditions, or privileges of employment.

## C. *Statutory Purpose*

Next, the majority claims we can read out the in-regard-to clause because it is inconsistent with the ADA's remedial purpose. *See* Maj. Op., Part II.B.3. Although I agree that consideration of a "'statute's . . . purpose' is one of the traditional 'tools' of statutory construction," *id.* at 26 (quoting *Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016)), we cannot allow our view of a statute's purpose to negate its plain language. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985); *see also* A. Scalia & B. Garner, § 2, at 57 (stating that except in rare cases, statutory purpose "cannot be used to contradict text or to supplement it").

In support of its position, the majority posits the hypothetical of a blind law clerk whose judge is satisfied with the clerk's unaccommodated ability to produce two draft opinions per month, rather than the three draft opinions required of the judge's sighted clerks. *See* Maj. Op. at 29–31. While the blind clerk may prefer the assistance of a

12

personal reader, she has suffered no adverse employment action in connection with the judge's decision to accept without complaint two draft decisions per month rather than supply a reader as a reasonable accommodation. Unlike the majority, I do not believe Congress, by passing the ADA, intended to micromanage employment decisions. *See Jones*, 349 F.3d at 1267. Rather, the ADA provides a remedy for harms suffered by disabled employees. In my view, the judge's decision to allocate work in chambers with consideration for the clerk's limitations is not and should not be actionable under the ADA. *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (stating that in the context of employment discrimination statutes, "we will not consider . . . 'an alteration of job responsibilities' to be an adverse employment action" (quoting *Crady v. Liberty Nat'l Bank & Tr. Co.*, 993 F.2d 132, 136 (7th Cir. 1993))). Thus, the majority's hypothetical highlights the different purposes of the discrimination clause and the in-regard-to clause. Congress could have made all failures to accommodate actionable. But it did not do so, instead directing that only failures in regard to the terms, conditions, or privileges of employment trigger liability under the Act.

Nor do I think our en banc decision in *Smith* supports a contrary result. *See* Maj. Op. at 33–35. The plaintiff in *Smith* suffered a traditional adverse employment action—he was terminated after his employer (a brake manufacturer) was unable to find an assignment within the light assembly department that he could safely perform, given his physical limitations (muscular injuries and chronic dermatitis). *See* 180 F.3d at 1160. If, instead, the plaintiff could safely work in that department by assembling components at a lesser rate than other employees, and the employer permitted him to remain in the job

13

while agreeing to accept only this reduced output that could be produced safely, it is doubtful an ADA claim would lie. In that scenario, the plaintiff could continue to receive all the benefits of employment, despite the employer's failure to reassign him.

Here the statute expressly includes the requirement that the failure to accommodate be "in regard to" terms, conditions, or privileges of employment. And unlike the majority, I am not persuaded that requiring a plaintiff bringing a claim under an employment discrimination statute to tie the alleged discrimination to an adverse employment action would render the promise of the statute "hollow." Maj. Op. at 35 (quoting *Smith*, 180 F.3d at 1167). Rather, the "in regard to" language strikes the appropriate balance between protection of disabled employees and deference to the business decisions of employers.

## D. *Pronouncements of the EEOC*

Next, the majority claims its understanding of the requisite elements of an ADA failure-to-accommodate claim is consistent with the EEOC's pronouncements. *See* Maj. Op., Part II.B.4. The majority first points to 29 C.F.R. § 1630.9(a), which states that "[i]t is unlawful for a[n employer] not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of its business." This regulation, however, simply reiterates the failure-to-accommodate definition found in § 12112(b)(5)(A), one of the seven examples of discrimination that satisfy the first element of § 12112(a)'s general rule. It does not purport to define the second element of that rule—that the discrimination

14

be "in regard to . . . terms, conditions, and privileges of employment." Indeed, the EEOC spoke to that second element in a separate regulation, 29 C.F.R. § 1630.4(a)(1). *See infra* Part III.A.1. As a result, to the extent the in-regard-to language is deemed ambiguous, the EEOC cannot be said to have provided an interpretation of that language in § 1630.9 to which we would owe any deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

Likewise, because § 1630.9 addresses only § 12112(a)'s discrimination clause— and is silent on the second element of Title I's "general proscription," *Smith*, 180 F.3d at 1160—I fail to see how that regulatory interpretation "implicitly rejects" the idea that the in-regard-to clause embodies a distinct and meaningful requirement of failure-to-accommodate claims. *See* Maj. Op. at 37. Even if the negative-implication canon could be deemed to point in that direction, *see id.* at 35–36, the surplusage canon undoubtedly points the opposite way. That is, if a plaintiff need satisfy only the discrimination clause to gain relief for an employer's failure to accommodate, the in-regard-to clause would be rendered of no consequence. *See* A. Scalia & B. Garner, § 26, at 174–79 (discussing the operation of the surplusage canon); *see also* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed*, 3 VAND. L. REV. 395, 401 (1950) ("[T]here are two opposing canons on almost every point."). What is more, if § 1630.9 *did* purport to lay out all the components of a failure-to-accommodate claim, "[f]ull stop," Maj. Op. at 37, its conspicuous omission of § 12112(a)'s in-regard-to requirement would leave that particular agency interpretation susceptible to being found "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

15

The majority also points to EEOC guidance documents in support of its understanding of the requisite elements of a failure-to-accommodate claim—specifically, interpretive guidance on Title I, *see* 29 C.F.R. pt. 1630 app., and enforcement guidance on failure-to-accommodate claims, *see* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2003-1, ENFORCEMENT GUIDANCE ON REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE ADA (2002), http://www.eeoc.gov/policy/docs/accommodation.html. Such documents "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Smith*, 180 F.3d at 1165 n.5 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). But "[w]hile the EEOC's guidance may be entitled to some consideration in our analysis, it does not carry the force of law and is not entitled to any special deference." *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 n.5 (10th Cir. 1999); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002) ("[T]he EEOC's interpretive guidelines do not receive *Chevron* deference."); *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 n.6 (1986) ("EEOC guidelines are properly accorded less weight than administrative regulations declared by Congress to have the force of law."). Rather, these guidance documents "are 'entitled to respect' . . . only to the extent that [they] have the 'power to persuade.'" *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490, 500 (6th Cir. 2006).

I find the persuasive power of this EEOC guidance to be minimal with respect to the issue at hand. As stated by the panel majority, although the EEOC's enforcement

16

guidance "discusses at length the meaning of the reasonable-accommodation requirement, it never purports to state all the elements of an ADA discrimination claim based on a failure to accommodate." *Exby-Stolley*, 906 F.3d at 916 n.8. Indeed, it does not mention the second element of § 12112(a) at all. And neither does the interpretive guidance on Title I address the meaning of this independent statutory requirement, referencing the in-regard-to clause just once. "Perhaps statements in the EEOC Guidance could be persuasive regarding the meaning of an antidiscrimination statute, but only if supported by some reasoning, not silence, however thundering." *Id.*

This silence is rendered even less persuasive by the clear parallels between the in-regard-to clause and similar language in Title VII, the statute upon which the ADA was modeled. *See* 42 U.S.C. § 2000e-2(a)(1) (Title VII disparate-treatment provision making it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment"); *Lanman v. Johnson Cnty.*, 393 F.3d 1151, 1155 (10th Cir. 2004) (stating that the ADA's "terms, conditions, and privileges of employment" language was borrowed from Title VII and should mean the same in both statutory contexts); *see also infra* Part III.A.2. In other words, "if it really intended to express guidance on the matter," *Exby-Stolley*, 906 F.3d at 916 n.8, one would have expected the EEOC to address why the judicial interpretation given that parallel language in Title VII—specifically, the necessary showing of "explicit or constructive *alterations* in the terms or conditions of employment," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) (emphasis added)—is inapplicable in the ADA failure-to-accommodate context. In the absence of any such explanation for how best to interpret the second

17

element of § 12112(a), the two EEOC guidance documents cited by the majority are, in my view, unhelpful to our current task.

## E. *Practices of our Sister Circuits*

Lastly, the majority conducts a thorough review of decisions from our sister circuits in support of its conclusion that incorporating an adverse-employment-action requirement into the failure-to-accommodate cause of action would "effectively create a circuit split." Maj. Op. at 54; *see id.* Part II.B.5. My survey of the circuit landscape reveals a decidedly muddier picture than the majority portrays.

The majority concedes that the decisions in other circuits "do not all point in the same direction." *Id.* at 39. What it fails to highlight, however, is that when faced with such inconsistent intracircuit decisions, nearly every federal court of appeals follows the general rule that the earlier panel opinion controls. *See, e.g.*, *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (stating that most circuits agree with "the basic rule that one panel cannot overrule another," and thus "follow the earlier of conflicting panel opinions"); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* § 36, at 303–04 (2016) ("With an intermediate appellate court, an earlier horizontal precedent nearly always controls. . . . The federal appellate courts in particular apply this solution to resolve a conflict between different panels and hold that the earlier opinion controls later panels . . . ."). And in several of our sister circuits, an earlier panel opinion that included some type of adverse employment action or alteration in the terms or conditions of employment as an element of a failure-to-accommodate claim was ignored or glossed over by subsequent panels addressing the same issue.

18

For example, the majority lumps the First and D.C. Circuits in with those that "either state, or strongly suggest, that there is no adverse-employment-action requirement in ADA failure-to-accommodate claims." Maj. Op. at 41. The majority cites *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002), for the conclusion that the First Circuit swaps out the requirement to show an adverse employment action in failure-to-accommodate claims for the requirement to show that the employer, "despite knowing of [the plaintiff's] alleged disability, did not reasonably accommodate it." Three years earlier, however, the First Circuit framed a prima facie failure-to-accommodate claim as also requiring one additional element:

> To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff ordinarily must furnish significantly probative evidence that he is a qualified individual with a disability within the meaning of the applicable statute; that he works (or worked) for an employer whom the ADA covers; that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; *and that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.*

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (emphasis added).[4] Similarly, the majority cites *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d. 232, 237 (D.C. Cir. 2018), for the conclusion that the D.C. Circuit omits any adverse-

---

[4] *Higgins* deemed these requirements, including the requirement that the failure to accommodate "affect[] the terms, conditions, or privileges of the plaintiff's employment," to be "rather undemanding." 194 F.3d at 264–65. This characterization aligns with my conclusion that the in-regard-to clause, while still an independent requirement that must be met in order to state a failure-to-accommodate claim, erects a barrier less demanding than that imposed by the "tangible employment action" required for a certain variety of Title VII sexual harassment claim. *See infra* Part III.A.

employment-action requirement in failure-to-accommodate claims. But in a 1997

opinion, the D.C. Circuit stated that "*[a]s the language of § 12112(a) makes clear*, for

discrimination (including denial of reasonable accommodation) to be actionable, it must

occur *in regard to* some adverse personnel decision or other term or condition of

employment." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997)

(first emphasis added); *see also id.* (further suggesting that there must be a "nexus"

between an "adverse action" and "a possible denial of reasonable accommodation").[5]

In both the First and D.C. Circuits, then, the earlier articulations of the requisite

elements of a failure-to-accommodate claim should control. The same holds true in the

Second, Seventh, and Ninth Circuits. While the majority asserts that "the predominant

view of [the decisions in these circuits] does not support the incorporation of an adverse-

employment-action requirement into an ADA failure-to-accommodate claim," Maj. Op.

at 41, the earliest relevant panel decision cited by the majority from all three circuits

_____

[5] As the majority opinion notes, the D.C. Circuit went on to state:

> We assume without deciding that if working conditions inflict pain or
> hardship on a disabled employee, the employer fails to modify the
> conditions upon the employee's demand, and the employee simply bears
> the conditions, this could amount to a denial of reasonable accommodation,
> despite there being no job loss, pay loss, transfer, demotion, denial of
> advancement, or other adverse personnel action. Such a scenario might be
> viewed as the ADA equivalent of the hostile working environment claim
> cognizable under other discrimination laws.

*Marshall*, 130 F.3d at 1099. Again, this reasoning jibes with my suggested approach to
aligning the contours of the in-regard-to clause with Title VII hostile work environment
claims, as discussed *infra* Part III.B.

20

points in the other direction. *See Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 108 (2d Cir. 2001) (stating that "the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action, must still exist for there to be liability" in reasonable accommodation cases); *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999) (including in the prima facie failure-to-accommodate case the requirement that "the disability caused the adverse employment action (a factor which is implied if not stated)"); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (requiring a failure-to-accommodate plaintiff to show that "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability" (alterations in original) (quoting *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (per curiam))).

I am not convinced by the majority's attempt to dismiss these earlier, controlling precedents. For example, despite the clear statement by the Ninth Circuit in *Samper v. Providence St. Vincent Medical Center*, the majority nevertheless posits that the predominant view from that circuit "may be stated succinctly: an adverse employment action is not a requisite element of an ADA failure-to-accommodate claim." Maj. Op. at 52 (citing *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018)). The passage the majority quotes from *Snapp v. United Transportation Union*, however, concerns only the definition of discrimination found in § 12112(b)(5)(A), not every element of a failure-to-accommodate claim. *See* 889 F.3d at 1095 ("The ADA treats the

21

failure to provide a reasonable accommodation as *an act of discrimination* if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." (emphasis added) (quoting only § 12112(b)(5)(A))); *cf. Exby-Stolley*, 906 F.3d at 913 (reasoning that prior panels that omitted an adverse-employment-action element may well have been "simply setting forth the failure-to-accommodate requirements of § 12112(b)(5)(A), not all the elements of an ADA claim based on failure to accommodate"). But not every act of discrimination affects a term, condition, or privilege of employment. *See Meritor Sav. Bank*, 477 U.S. at 64, 67 (discussing workplace harassment). In telling contrast to *Snapp*, the discussion in *Samper* concerned not just the definition of discrimination in the failure-to-accommodate context—an element that is undisputed in this en banc appeal—but rather the complete prima facie showing needed to bring such a claim, incorporating *both* the discrimination clause *and* the in-regard-to clause of Title I's general rule. *See* 675 F.3d at 1237 (citing *both* § 12112(b)(5)(A) *and* § 12112(a)). As such, *Samper* and *Snapp* do not appear to be in tension. *See* Garner et al., *The Law of Judicial Precedent* § 36, at 300 ("A court considering discordant decisions must first determine whether the perceived conflict between them is real. If at all possible, the opinions should be harmonized.").

Overall, however, the primary reason the authority cited by the majority from our sister circuits fails to persuade is not because it runs afoul of the "law of the circuit" doctrine, but because it strays from the text of Title I's "general proscription." Those opinions that list the prima facie elements of a § 12112(b)(5)(A) discrimination claim

22

without connecting the failure to accommodate to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment," are reading words out of the ADA. The decisions from our sister circuits that do correctly ground themselves in § 12112(a)'s text—and thus correctly recognize the operation of the in-regard-to clause in conjunction with the discrimination clause—all require some showing that a failure-to-accommodate plaintiff suffered either an adverse employment action or some other detrimental alteration in the terms, conditions, or privileges of employment. *See, e.g.*, *Marshall*, 130 F.3d at 1099 ("As the language of § 12112(a) makes clear . . . .").

### III. INTERPRETING THE IN-REGARD-TO CLAUSE

I now turn to what I view as the core question presented by this en banc appeal: what the in-regard-to clause requires. With guidance from decisions applying Title VII's analogous "with-respect-to" provision, I conclude the plaintiff's burden under the in-regard-to clause is less onerous than suggested by some of our decisions applying an "adverse employment action" requirement. But, even in a failure to accommodate case, the plaintiff must satisfy that burden.

Interpreting the role of the in-regard-to clause encompasses two inquiries: (1) What aspects of an employer's relationship with an employee are covered by the in-regard-to clause?; and (2) When is discrimination taken "in regard to" those covered aspects? I undertake each inquiry in turn.

23

## A. *The Scope of the In-Regard-To Clause*

Although the language of the statute identifies specific situations covered by the in-regard-to clause, the EEOC has provided additional guidance on that question. Therefore, I begin by setting forth the relevant EEOC regulation. Next, I turn to precedent interpreting Title VII. Last, I discuss which aspects of an employer's relationships are covered by the in-regard-to clause.

### 1. EEOC Regulations

Congress granted the EEOC the authority to issue regulations to carry out the ADA. *See* 42 U.S.C. § 12116. The EEOC has used this authority to adopt a regulation expounding on the aspects of employment that are protected under the ADA:

> It is unlawful for a[n employer] to discriminate on the basis of disability against a qualified individual in regard to:
>
> (i) Recruitment, advertising, and job application procedures;
>
> (ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;
>
> (iii) Rates of pay or any other form of compensation and changes in compensation;
>
> (iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;
>
> (v) Leaves of absence, sick leave, or any other leave;
>
> (vi) Fringe benefits available by virtue of employment, whether or not administered by the [employer];
>
> (vii) Selection and financial support for training, including: apprenticeships, professional meetings, conferences and other related activities, and selection for leaves of absence to pursue training;

24

(viii) Activities sponsored by a[n employer], including social and recreational programs; and

(ix) Any other term, condition, or privilege of employment.

29 C.F.R. § 1630.4(a)(1).

Through this regulation, the EEOC has defined certain circumstances that fall within the scope of the ADA. But § 1630.4(a)(1) also contains the same catchall as § 12112(a): other terms, conditions, and privileges of employment. *See* 29 C.F.R. § 1630.4(a)(1)(ix). Thus, neither the statutory nor the regulatory categories are exclusive.

## 2. Title VII

As previously mentioned, this court has recognized the importance of interpreting the ADA congruently with similar language in Title VII. *See Lanman*, 393 F.3d at 1155 ("Congress borrowed [the terms, conditions, and privileges of employment] language from Title VII," and its "incorporation of this language into the ADA is indicative of its intent that the language mean the same in the ADA as it does in Title VII."); *id.* ("The parallel purposes and remedial structures of the two statutes also support a consistent interpretation."); *see also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

Under the disparate-treatment provision of Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). I find it helpful to consider Title VII's with-respect-to clause in interpreting the ADA's in-regard-to clause. In doing so, I first examine the treatment of claims under Title VII for failure to accommodate religious practices, which require the plaintiff to show that the non-accommodation was with respect to the terms, conditions, or privileges of employment. Next, I explore the scope of Title VII's "terms, conditions, or privileges of employment" language, which in my view is broader than some of our decisions suggest. Finally, I apply the lessons learned from that analysis to the ADA's in-regard-to clause.

a. *Failure to accommodate under Title VII*

Given the clear parallels between the ADA and Title VII, it is instructive to compare failure-to-accommodate claims under both statutes. In the Title VII context, a failure-to-accommodate claim addresses an employee's religious practices, rather than her disability. And a plaintiff seeking to state a claim for an employer's failure to accommodate her religious practices cannot stand merely on the employer's non-accommodation—rather, she must show that she was subjected to an adverse employment action in connection with that non-accommodation. Specifically, we require an employee to show that she was either fired or not hired for failing to comply with an employer requirement that conflicts with her religious belief. *See Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (fired); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1486 (10th Cir. 1989) (not hired).

26

The Supreme Court's most recent discussion of Title VII religious failure-to-accommodate claims came in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015). There, the Court clarified that these claims can be brought under either Title VII's disparate-treatment provision, 42 U.S.C. § 2000e-2(a)(1), or its disparate-impact provision, *id.* § 2000e-2(a)(2). *See* 135 S. Ct. at 2033–34.[6] Regarding a religious failure-to-accommodate claim brought under the disparate-treatment provision, the Court held that Title VII gives religious practices "favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's' 'religious observance and practice.'" *Id.* at 2034 (ellipsis in original); *see also id* at 2033 ("An employer may not make a [ job] applicant's religious practice, confirmed or otherwise, a factor in employment decisions."); *id.* at 2034 (Alito, J., concurring in the judgment) ("Title VII . . . prohibits an employer from taking an adverse

---

[6] Disparate treatment and disparate impact "are the only causes of action under Title VII." *Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015). Disparate treatment exists when "'[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic].' Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (second alteration and ellipsis in original) (citation omitted) (first quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); then quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Conversely, "disparate-impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Id.* (quoting *Int'l Brotherhood of Teamsters*, 431 U.S. at 335 n.15). "Under a disparate-impact theory of discrimination, 'a facially neutral employment practice may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a "disparate-treatment" case.'" *Id.* at 52–53 (alteration in original) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645–46 (1989)).

employment action (refusal to hire, discharge, etc.) 'against any individual . . . because of such individual's . . . religion.'" (footnote omitted) (ellipses in original) (quoting 42 U.S.C. § 2000e-2(a))). *Abercrombie & Fitch* thus makes clear that, in the Title VII context, a disparate-treatment claim for failure to accommodate religious practices requires that the non-accommodation result in an adverse impact with respect to hiring, firing, or the terms, conditions, or privileges of employment.

The majority contends that the inclusion of an adverse-employment-action requirement in Title VII religious failure-to-accommodate claims can be explained by the fact that the cases mentioning that requirement all concern disparate treatment. *See* Maj. Op. at 14–15 n.3. And it is "wholly unremarkable" "[t]hat a disparate-treatment claim—under Title VII *or* the ADA—would require an adverse employment action." *Id.* Therefore, the majority asserts that the inclusion of an adverse-employment-action requirement in Title VII failure-to-accommodate claims "sheds no light on the entirely separate question of whether such a requirement exists for failure-to-accommodate claims under the ADA, where a freestanding claim exists for such unlawful conduct." *Id.*

The majority is correct that failure to accommodate under the ADA is a freestanding discrimination claim, while failure to accommodate under Title VII is not. *Compare* 42 U.S.C. § 12112(b)(5)(A) *with* 42 U.S.C. § 2000e-2(a). But the need for an adverse employment action is derived not from the disparate-treatment nature of the Title VII claim, but from the separate requirement that the disparate treatment have a significant impact on employment status. Thus, what matters for our purposes is not that failure to accommodate is brought as a disparate-treatment claim under Title VII and a

28

freestanding claim under the ADA, but that *both* claims must satisfy the "terms, conditions, and privileges" element (either "with-respect-to" or "in-regard-to"). It is that element that imposes the need for at least some showing of an alteration to the terms or conditions of employment, and not the discrimination itself, however characterized. *See Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (describing "adverse employment action" as "judicial shorthand . . . for the fact that [federal employment discrimination] statutes require the plaintiff to prove that the employer's action of which he is complaining altered the terms or conditions of his employment"); *see also Meritor Sav. Bank*, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."). In other words, freestanding or not, the relevant discrimination under both statutes—a failure to accommodate—must nevertheless be "with respect to" or "in regard to" the terms or conditions of employment, and consequently must work a disruption in employment terms or conditions that is more than de minimis.

The inclusion of failure-to-accommodate claims in Title VII's disparate-treatment provision also undercuts the majority's discussion of the purportedly sharp distinction between those two forms of discrimination. *See* Maj. Op., Part II.B.2; *supra* Part II.B. As previously discussed, the majority asserts that disparate-treatment claims require a showing of an employer *action*, while failure-to-accommodate claims require a showing of an employer *omission*. *See* Maj. Op. at 21. The problem with constructing this fundamental dichotomy is that Title VII includes a claim for religious discrimination that

29

has one foot in both worlds—that is *both* a disparate-treatment claim *and* a failure-to-accommodate claim.

Further, there is no doubt that ADA failure-to-accommodate claims are meaningfully related to failure-to-accommodate claims brought under Title VII. *See Thomas*, 225 F.3d at 1155 n.5 ("A claim of religious discrimination under Title VII is similar to a claim under the ADA . . . ."). "[I]n both situations, the employer has an affirmative obligation to make a reasonable accommodation." *Id.*; *cf. Abercrombie & Fitch*, 135 S. Ct. at 2034 (stating that a failure-to-accommodate claim brought under Title VII's disparate-treatment provision "affirmatively obligat[es] employers" to accommodate religious practices). Additionally, just as the ADA "requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities," *Barnett*, 535 U.S. at 397, Title VII "gives [religious practices] favored treatment," *Abercrombie & Fitch*, 135 S. Ct. at 2034. Thus, because a religious failure-to-accommodate claim under Title VII requires some sort of adverse impact on the terms or conditions of employment, over and above a showing of the failure to accommodate itself, it would not be "illogical," Maj. Op. at 23, to require a plaintiff to make the same showing in the analogous ADA failure-to-accommodate context.

I thus proceed to assess what that showing requires.

b. *The scope of "terms, conditions, or privileges" under Title VII*

In interpreting Title VII, the Supreme Court has long recognized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment."

30

*Meritor Sav. Bank*, 477 U.S. at 64 (1986) (quoting *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)). When "the underlying employment relationship is contractual, it follows that the 'terms, conditions, or privileges of employment' clearly include benefits that are part of an employment contract." *Hishon v. King & Spalding*, 467 U.S. 69, 74 (1984). But "the language of Title VII is not limited to 'economic' or 'tangible' discrimination," *Meritor Sav. Bank*, 477 U.S. at 64, and covers more than "'terms' and 'conditions' in the narrow contractual sense," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). Even when a contract is not made, "[a]n employer may provide its employees with many benefits that it is under no obligation to furnish by any express or implied contract." *Hishon*, 467 U.S. at 75. "A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *Id.* "Those benefits that comprise the 'incidents of employment,' or that form 'an aspect of the relationship between the employer and employees,' may not be afforded in a manner contrary to Title VII." *Id.* at 75–76 (citation and footnotes omitted) (quoting S. Rep. No. 867, 88th Cong., 2d Sess., 11 (1964); then quoting *Chem. & Alkali Workers v. Pittsburg Plate Glass Co.*, 404 U.S. 157, 178 (1971)).

Title VII can be "violated by either explicit or constructive alterations in the terms or conditions of employment." *Ellerth*, 524 U.S. at 752. A plaintiff may establish constructive alterations in the terms or conditions of employment "by proving that

discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank*, 477 U.S. at 66.

In recognizing hostile work environment claims, the Supreme Court began by noting that "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64 (second alteration in original). But "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Id.* at 67. That is, Title VII is not meant to be "a general civility code for the American workplace." *Oncale*, 523 U.S. at 80. As a result, the "'mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (ellipsis in original) (quoting *Meritor Sav. Bank*, 477 U.S. at 67); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (citation omitted) (quoting *Oncale*, 523 U.S. at 82)). Rather, for constructive alterations in the terms and conditions of employment to be actionable, the conduct "must be severe or pervasive." *Ellerth*, 524 U.S. at 752; *see also Faragher*, 524 U.S. at 788 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment."). Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to *alter the conditions of the victim's employment* and create an abusive working environment.'"

32

*Harris*, 510 U.S. at 21 (emphasis added) (citation omitted) (quoting *Meritor Sav. Bank*, 477 U.S. at 65, 67).

"The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. Determining "whether an environment is 'hostile' or 'abusive'" requires "looking at all the circumstances," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. If the harassment is sufficiently severe, it may result in a "hostile-environment constructive discharge," which exists where "working conditions [are] so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004).

The Supreme Court has contrasted hostile work environment claims with another type of sexual harassment: *quid pro quo*. A *quid pro quo* claim exists where a supervisor's threats to retaliate if the employee does not comply with sexual demands are carried out. *Ellerth*, 524 U.S. at 752–53. These *quid pro quo* cases, unlike hostile work environment cases, involve an explicit alteration in the terms and conditions of

33

employment. *Id.* at 752. The Supreme Court summarized the difference in the proof

required for these claims:

> When a plaintiff proves that a *tangible employment action* resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the *employment decision itself constitutes a change in the terms and conditions of employment* that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

*Id.* at 753–54 (emphases added).

"A tangible employment action constitutes a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." *Id.* at 761.[7] But

*Ellerth* delineated tangible employment actions "only to 'identify a class of [hostile work

environment] cases' in which an employer should be held vicariously liable (without an

affirmative defense) for the acts of supervisors." *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 64 (2006) (alteration in original) (quoting *Ellerth*, 524 U.S. at 760).

"*Ellerth* did not discuss the scope of the general antidiscrimination provision." *Id.* Rather,

the Court was focused on changes in employment status because it was considering

---

[7] It is important to note that *Ellerth*'s definition of tangible employment action, along with the Court's jurisprudence on hostile work environment claims, covers both the existence of discrimination (*i.e.*, unfavorable treatment) and that it was taken with respect to hiring, firing, or the other terms, conditions, and privileges of employment. It is necessary to consider the required degree of unfavorable treatment separately from the aspects of employment that are protected.

Additionally, *Ellerth* dealt only with discriminatory actions taken after commencement of employment, which is why it discussed tangible employment actions in terms of a *change* in employment status. *Ellerth* did not address discriminatory treatment existing since the inception of employment or the provision of benefits.

"action[s] result[ing] from a refusal to submit to a supervisor's sexual demands." *Ellerth*, 524 U.S. at 753. As such, the scope of "tangible employment action" is, at least in theory, narrower than the scope of "adverse employment action," as the latter draws in not only concrete actions affecting job status but also the constructive alteration of the conditions of employment.

This court adopted the concept of an "adverse employment action" as a shorthand for describing Title VII's requirement that discrimination is actionable only if taken with respect to hiring, firing, or the other terms, conditions, and privileges of employment. We "liberally define[] the phrase 'adverse employment action,'" *Sanchez*, 164 F.3d at 532, and "take a case-by-case approach, examining the unique factors relevant to the situation at hand," *id.* (internal quotation marks omitted), to assess whether such action has occurred. Adverse employment actions "are not simply limited to monetary losses in the form of wages or benefits." *Id.* But this court "will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action." *Id.* (quoting *Crady*, 993 F.2d at 136). Similarly, "conduct that has no more than a de minimus impact on the employee's future job opportunities is not an adverse employment action." *Wilson v. Harvey*, 156 F. App'x 55, 58 (10th Cir. 2005) (unpublished). This means that "not every perceived indignity will rise to the level of an adverse employment action." *C.R. Eng.*, 644 F.3d at 1041 (quoting *Haynes*, 456 F.3d at 1222).

Notwithstanding our ostensibly liberal definition of the phrase, *see Sanchez*, 164 F.3d at 532, and despite the limitations of *Ellerth*'s holding, this court has on occasion equated "adverse employment action" with "tangible employment action." *See, e.g.*, *Hiatt*

*v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) ("For discrimination claims, an adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (internal quotation marks omitted)); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237–38 (10th Cir. 2004) (relying on *Ellerth*'s definition of tangible employment action to define adverse employment action); *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1230 (10th Cir. 2004) ("The adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (internal quotation marks omitted)); *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) ("Conduct rises to the level of 'adverse employment action' when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (internal quotation marks omitted)).

Thus, while the with-respect-to clause covers activity broader than identified in *Ellerth*, in using the term "adverse employment action" as a shorthand for the requirements of that clause, we have sometimes unnecessarily narrowed its reach. But even where there is no requirement that discriminatory conduct be undertaken with respect to an employment action—as in Title VII anti-retaliation claims—the plaintiff must still show more than de minimis harm. *See White*, 548 U.S. at 64, 67 (stating that while Title VII's "antiretaliation provision, unlike the substantive provision, is not

36

limited to discriminatory actions that affect the terms and conditions of employment," that provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm").

### 3. What the ADA Covers

Turning back to the ADA, because the in-regard-to clause must be given some meaning, I would interpret the clause as tying the claimed discrimination to employment by providing an expansive, but not exclusive, list of the protected relationships with the employer. *See* 29 C.F.R. § 1630.4(a)(1). And I would look to analogous Title VII jurisprudence to fill the remaining gaps.

When interpreting the ADA, this court has adopted Title VII's concepts of both adverse employment action, *see Lincoln*, 900 F.3d at 1192–93; *C.R. Eng., Inc.*, 644 F.3d at 1040; *Mathews*, 263 F.3d at 1167, and hostile work environment, *see Lanman*, 393 F.3d at 1156. That is, the plaintiff can make out an ADA discrimination claim either by showing an express change or disparity in the terms or conditions of employment, or by showing a constructive change or disparity in those terms or conditions based on pervasive hostility or discomfort. Under the latter approach, a plaintiff need not wait for an explicit change in the terms or conditions of employment to advance a claim for failure to accommodate. Instead, where the failure to accommodate results in a constructive alteration in those terms or conditions, the employee can satisfy § 12112(a)'s in-regard-to clause.

As mentioned, some of this court's decisions have inappropriately limited the term "adverse employment action" (for both Title VII and the ADA) to *Ellerth*'s narrower

37

definition of tangible employment action. Labels such as "hostile work environment," "tangible employment action," and "adverse employment action" are helpful to the extent they describe one method of satisfying the in-regard-to clause. But when these judicially coined phrases begin to take on a meaning of their own, divorced from the text of the statute, they can become more harmful than helpful to the goal of statutory construction. The concept of adverse employment action appears headed down this path, and I would turn back to the text of the statute to stop that progression.

Like Title VII's substantive provision, the ADA uses terms such as "hiring," "discharge," "employee compensation," "job training," and "other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), thereby "explicitly limit[ing] the scope of that provision to actions that affect employment or alter the conditions of the workplace," *see White*, 548 U.S. at 62. But the terms, conditions, and privileges of employment include not only "benefits that are part of an employment contract," *Hishon*, 467 U.S. at 74, but also "[t]hose benefits that comprise the 'incidents of employment,' or that form 'an aspect of the relationship between the employer and employees,'" *id.* at 75–76 (citation and footnotes omitted) (quoting S. Rep. No. 867, at 11; then quoting *Chem. & Alkali Workers*, 404 U.S. at 178). And the "terms, conditions, or privileges" language "is not limited to 'economic' or 'tangible' discrimination." *Meritor Sav. Bank*, 477 U.S. at 64.

It is this more expansive reading of the in-regard-to clause that I believe governs a claim under the ADA. I turn now to application of that reading.

38

## B. *Application of the In-Regard-To Clause*

The last step in analyzing claims under the ADA is tying the discrimination clause (through the specific discriminatory theory) to the in-regard-to clause. The requirement that the discrimination be "in regard to" one of the protected aspects of an employer's relationship provides the final limitation on the type of discrimination actionable under the ADA. As with Title VII's substantive and anti-retaliation provisions, not every discriminatory action (or omission) is covered by the ADA. *See Meritor*, 477 U.S. at 64, 67 (recognizing that although when "a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex," "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment" (alteration in original)); *White*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."); *id.* at 68 (requiring a plaintiff to show "*material* adversity because . . . it is important to separate significant from trivial harms"). In short, the discrimination must be in regard to the employment-related aspects covered by § 12112(a) and it must cause more than de minimis harm.

The method of tying together the discrimination and in-regard-to clauses varies for each discrimination theory. For example, a disparate-treatment claim—where "the protected trait . . . actually motivated the employer's decision," *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Hazen Paper Co. v. Biggins*, 607 U.S. 604, 610 (1993))—brought under § 12112(b)(1) requires analyzing whether the unfavorable treatment was in regard to the covered aspects. Conversely, a disparate-impact claim—

39

based on "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity," *id.* (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977))—brought under § 12112(b)(6) necessitates determining whether the "qualification standards, employment tests or other selection criteria" used by the employer "screen[ed] out or tend[ed] to screen out an individual with a disability or a class of individuals with disabilities" in regard to those covered aspects.

Failure-to-accommodate claims require a different method of proof. The plaintiff must show that the employer did not make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" in regard to the terms or conditions of employment. 42 U.S.C. § 12112(a), (b)(5)(A). Thus, an employer violates the discrimination and in-regard-to clauses by failing to make reasonable accommodations that are necessary to ensure an otherwise qualified individual with a disability is placed on equal ground with other employees in regard to the covered employment relationships. As illustrated in the following hypotheticals, satisfaction of this two-prong claim need not be difficult.

Consider the blind law clerk discussed by the majority. *See* Maj. Op. at 29–31. Suppose the judge rejects the request for a reader, accepts two draft opinions per month from the blind clerk, while requiring three from each of his sighted clerks, and reduces the blind clerk's pay by one-third. Under those circumstances, the failure to provide reasonable accommodation is "in regard to" employee compensation and would be actionable under the ADA.

40

I would view the claim differently if there are no employment-related consequences of the blind law clerk's failure to meet the three-opinion requirement. If the judge does not provide a reasonable accommodation but also does not take any disciplinary action against the blind clerk, I would conclude that the judge's failure to provide a reasonable accommodation was not in regard to the covered aspects of employment. *Cf. Sanchez*, 164 F.3d at 532 (stating that while we "liberally define[] the phrase 'adverse employment action,'" we nevertheless "will not consider . . . an alteration of job responsibilities to be an adverse employment action" (internal quotation marks omitted)). Similarly, if the judge terminated the blind clerk for breaches of chambers confidentiality—completely unrelated to the failure to produce three opinions per month—the judge has similarly not failed to provide a reasonable accommodation in regard to the covered aspects.

To take the hypothetical one step further, I am convinced the blind clerk would have a claim under the ADA if the failure to accommodate constructively impacted her conditions of employment. Suppose the judge is content with the clerk's two opinions per month, but her co-clerks are not. In response, those clerks make abusive comments, interfere with the blind clerk's performance by rearranging the furniture, and generally subject her to a hostile work environment. Much like a claim under Title VII, if the failure to accommodate resulted in the disabled employee being subjected to pervasive harassment, I would conclude that it is in regard to the conditions of employment.

Thus, I am not persuaded by the amici's[8] concern that the panel majority's imposition of an adverse employment action requirement in failure to accommodate cases would prohibit claims by "a person with a condition affecting bladder control [] who soils herself because the employer refuses to grant her a workstation near the restroom," a "veteran with PTSD" who "need[s but is prohibited from bringing to work] an emotional support animal to deal with anxiety and panic attacks," and has "to endure anxiety and panic attacks throughout the workday," PELA Br. at 5–6, or an employee who is forced to work in significant pain when the employer denies a request for reasonable accommodations.

Although the amici's concerns might be valid if evaluated under the narrow definition of adverse employment action I reject above, they do not carry the same weight when the interpretation of the in-regard-to clause is true to its statutory language and guidance from Title VII. Under my interpretation, these claims would be analyzed to determine whether the impact of the failure to provide reasonable accommodation is sufficiently severe or pervasive to alter the terms or conditions of employment. *Cf. Vande Zande v. Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995) ("The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort."). Under this test, an employee required to work in significant pain, an employee forced to soil herself, or an employee

---

[8] The amici include the Colorado Plaintiff Employment Lawyers Association, the National Disability Rights Network, the National Employment Lawyers Association, and the United States.

42

who suffers anxiety and panic attacks could easily show the impact of the failure to accommodate altered the terms or conditions of employment, as these situations all clearly amount to more than "a mere inconvenience." *Sanchez*, 164 F.3d at 532. As the D.C. Circuit has reasoned,

> if working conditions inflict pain or hardship on a disabled employee, the employer fails to modify the conditions upon the employee's demand, and the employee simply bears the conditions, this could amount to a denial of reasonable accommodation, despite there being no job loss, pay loss, transfer, demotion, denial of advancement, or other adverse personnel action.

*Marshall*, 130 F.3d at 1099; *see also Hill*, 897 F.3d at 239 ("A reasonable jury could conclude that forcing [an employee] to work with pain when that pain could be alleviated by his requested accommodation violates the ADA.").

With this framework in mind, I turn to the jury instructions given in this case.

### IV. JURY INSTRUCTIONS

The district court instructed the jury that Ms. Exby-Stolley must prove she "was discharged from employment or suffered another adverse employment action by [the County]." App. at 440. The jury instructions defined adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 449. In other words, the district court instructed the jury that an adverse employment action is the equivalent of a tangible employment action under *Ellerth*.

For the reasons discussed above, I believe this construction is too narrow. The ADA's in-regard-to clause covers a significantly greater swath of employment

43

relationships than those reflected in tangible employment actions. But that does not mean the restrictive definition included in the jury instructions resulted in prejudicial error based on the in-regard-to aspects at issue in this case.

The district court need not instruct the jury on every facet of the in-regard-to clause in every case. If, for example, a plaintiff alleges discrimination in regard to hiring, it would be unnecessarily confusing to instruct the jury that the in-regard-to clause includes "[j]ob assignments, job classifications, organizational structures, position descriptions, lines of progression, . . . seniority lists" and "[f]ringe benefits available by virtue of employment," 29 C.F.R. § 1630.4(a)(1), because the plaintiff did not allege discrimination in regard to those aspects of the employment relationship. Requiring the court to instruct on every aspect of the in-regard-to clause in every case could result in a finding of liability for a discriminatory act not alleged or one that occurred outside the statute of limitations. Here, Ms. Exby-Stolley claimed she was terminated from employment based on her disability. The jury instructions, which included firing in the definition of adverse employment action, adequately covered this theory.

On appeal, Ms. Exby-Stolley makes two arguments challenging those instructions. First, she argues that a failure-to-accommodate claim does not require proving an adverse employment action. Although I would more broadly define "adverse employment action" to accurately reflect the standards imposed by the in-regard-to clause, I would hold that Ms. Exby-Stolley was required to satisfy that clause to prove her failure-to-accommodate claim. That is, unlike the majority, I do not read the statute as providing that satisfaction of the discrimination clause is sufficient.

44

Second, Ms. Exby-Stolley argues that if an adverse employment action was required, the district court should have instructed the jury that constructive discharge is an adverse employment action.[9] Ms. Exby-Stolley is correct that constructive discharge satisfies the in-regard-to clause. *See Green v. Brennan*, 136 S. Ct. 1769, 1776–77 (2016). But I agree with the panel majority that Ms. Exby-Stolley failed to allege constructive discharge—either for disparate treatment or failure to accommodate—and therefore was not entitled to a jury instruction including that theory. *See Exby-Stolley*, 906 F.3d at 918–19. The jury was instructed that termination of employment is an adverse employment action, but it was not convinced that Ms. Exby-Stolley had been fired.

For these reasons I would conclude that the jury instructions in this case, at least in relation to the allegations raised, "accurately informed the jury of the governing law," *Sherouse v. Ratchner*, 573 F.3d 1055, 1060 (10th Cir. 2009), and did not mislead the jury in any way, *Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001). And, as a result, I would affirm the jury's verdict.

## V. CONCLUSION

Section § 12112(b) of the ADA identifies seven circumstances that satisfy the discrimination clause in § 12112(a), one of two express requirements in Title I's general proscription of employment discrimination on the basis of disability. But the construction of § 12112(a), as dictated by its plain language, does not allow those enumerated

---

[9] Importantly, this was the only challenge to the district court's construction of what constitutes an adverse employment action preserved by Ms. Exby-Stolley in her opening brief. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

45

examples of discrimination to displace the second express requirement—the in-regard-to clause. Because the majority fails to give effect to that independent requirement, I cannot join in its analysis. Instead, reviewing the jury instructions in light of the allegations advanced, I would uphold the jury's verdict. Accordingly, I respectfully dissent.

16-1412, *Exby-Stolley v. Board of County Commissioners*

**HARTZ**, J., Circuit Judge, joined by **TYMKOVICH**, C.J., dissenting.

I join almost all of Judge McHugh's dissent. I write separately only to note the minor difference in our views and to express a few other observations about the dispute before the en banc court. I will limit any repetition of what already appears in that dissent and in my panel opinion.

My sole discomfort with Judge McHugh's dissent concerns the discussion of the scope of the ADA provision restricting discrimination prohibited by the Act to discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This provision is similar to provisions limiting liability under other antidiscrimination statutes, in particular Title VII, which restricts liability to discrimination "with respect to [an individual's] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a). The Title VII language is often paraphrased as requiring proof of an adverse employment action. Following that tradition, I will refer to the above-quoted language of the ADA as the adverse-employment-action requirement.

I have concerns that this court's prior caselaw has too narrowly circumscribed what constitutes an adverse employment action. Judge McHugh's dissent may well provide the proper correction to that caselaw. But I think we should refrain from opining on that issue in this case. To begin with, the issue was not raised before the panel or in the panel opinions. Appellant Exby-Stolley's argument was that there is no adverse-

employment-action requirement for a failure-to-accommodate claim. She argued that there should have been no instruction whatsoever on the notion of an adverse employment action, not that the instruction given was too restrictive. The gist of the opinion of the panel majority was quite simple and straightforward: First, the opinion looked for the source of the adverse-employment-action requirement in employment-discrimination claims and concluded that the requirement derives from the language in employment-discrimination statutes limiting liability to discrimination that is "with respect to" or "in regard to" the "terms, conditions, or privileges of employment." In other words, the term *adverse employment action* is merely shorthand for expressing the terms-or-conditions statutory language. Second, the opinion looked at the text of § 12112 and concluded that the terms-or-conditions language of subsection (a) applied to all discrimination claims under that section, including failure-to-accommodate claims. Because this circuit has considerable precedent regarding the meaning of *adverse employment action*, and because Appellant did not argue that the meaning of the term should be modified for failure-to-accommodate cases, the panel proceeded, quite naturally in my view, to apply our caselaw to the case at hand.

Nor did this court's order granting en banc rehearing request briefing on the meaning of *adverse employment action*. The only question that we requested the parties to address specifically in their supplemental briefing was "[w]hether an adverse employment action is a requisite element of a failure-to-accommodate claim under the [ADA]." Order at 2, Dec. 18, 2018. To be sure, the meaning of *adverse employment action—*that is, the meaning of the terms-or-conditions language in employment-

2

discrimination statutes—has been raised during the en banc proceedings. But the only brief to raise the issue is the amicus brief submitted by the federal government. It criticizes not only the panel opinion's understanding of what constitutes an adverse employment action but also argues that this court has misinterpreted the statutory language in other contexts, including claims under Title VII.

Although the government's brief and oral argument make a good case that we have adopted a too-restrictive notion of adverse employment action, I think it would be unfortunate for this court to abandon long-standing precedent without receiving briefing from interested persons with other points of view. There are important issues that need to be explored. I recognize the temptation to adopt a very broad interpretation of adverse employment action, because all discrimination (including the failure to make reasonable accommodations for a disabled person) is offensive. But the employment-discrimination statutes were not intended to prohibit all offensive discriminatory conduct at the workplace. For example, not all bigoted statements by supervisors to their subordinates create a cause of action. Whether they create a prohibited hostile work environment depends on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) (internal quotation marks omitted). The ADA, perhaps more than any of the other employment-discrimination statutes, signals in the language used to create the adverse-employment-action requirement that it applies only to *significant* employment discrimination. It does not merely state that discrimination

3

must be with respect to the "terms, conditions, or privileges of employment," which in itself could be interpreted quite broadly. It even goes beyond the Title VII language that discrimination must be "with respect to . . . compensation, terms, conditions, or privileges of employment." The ADA requires that the discrimination be "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ejusdem generis canon of statutory construction, the words "other terms, conditions, and privileges of employment" should be read to mean "terms, conditions, and privileges of employment" similar to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, [and] job training." *See*, e.g., *Babb v. Wilkie*, 140 S. Ct. 1168, 1176 n.4 (2020) (in construing "to fail or refuse to hire or to discharge any individual or otherwise *discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment*," in the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), the italicized phrase, although it could independently be "read more broadly to encompass things that occur before a final decision is made," should, under the *ejusdem generis* canon, be read "to refer—like the prior terms—to the final decision" (emphasis added)). The ADA statutory language certainly encompasses a great deal of employer action, but it is all *significant* action. And the list of those actions in the statute amounts to surplusage if the statute covers *any* terms, conditions, or privileges of employment.

One might argue that there is no need for an adverse-employment-action instruction in failure-to-accommodate cases because every failure-to-accommodate claim

4

necessarily concerns an adverse employment action.  This may be true, for example, in jurisdictions where a request for accommodation must be for an accommodation that would enable the disabled employee to perform the essential functions of a job.  *See*, e.g., *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (in reasonable-accommodation case the plaintiff bears the burden of showing, among other things, "(3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations"); *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001) ("[A] disabled employee may establish a *prima facie* case under the ADA if s/he shows that s/he can perform the essential functions of the job with reasonable accommodation and that the employer refused to make such an accommodation."); Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, § 12.7 (plaintiff in reasonable-accommodation case must prove that "a reasonable accommodation is available that would have enabled the plaintiff to [apply or qualify for] [perform the essential functions of] the job" (brackets in original)).[1]  But to say that an adverse-employment-action instruction is unnecessary is not to say that it is incorrect (as opposed to superfluous); and it may be useful in cases, such as this, where the absence of an adverse employment action frees the jury from having to determine whether the employer acted unreasonably in failing to

---

[1]  It is not clear to me where these authorities get the essential-functions-of-the-job requirement.  I see nothing in the language of § 12112(b)(5)(A) that would impose that restriction.  Perhaps the terms-or-conditions language of § 12112(a) could be the source.

5

make an accommodation. That is, if the jury determines that there has been no adverse employment action, it need not tackle the other elements of a discrimination claim.

In my view, it is worth awaiting an appropriate case in which there is focused argument on the scope of the adverse-employment-action requirement of the ADA, even though we may ultimately resolve the issue in the way recommended by Judge McHugh's dissent. (On the other hand, if the Supreme Court decides to review this case, which could be very helpful to the lower courts, I am sure that it will be offered an ample supply of briefs that would be useful in construing the terms-or-conditions language in the various employment-discrimination statutes.)

I would also like to add some observations about the en banc opinion's use of judicial authority. None of the circuit cases cited in that opinion are binding on this en banc court on the issue of whether an adverse employment action is required to state a reasonable-accommodation claim. Their value to this court is in their persuasiveness. In that respect, they are sorely lacking. Not one of those cases explains why there is no adverse-action requirement. Not one addresses the textual argument made in Judge McHugh's dissent or the panel majority opinion. In only two or three was the issue raised by the parties, and in only one (*Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 942 n.1 (8th Cir. 2019)) was resolution of the issue apparently necessary to decide the appeal—indeed, in almost all of them there was an obvious adverse-employment-action, such as termination. The essential elements of persuasive authority are missing. *See* Garner, *et al.*, The Law of Judicial Precedent § 16 (2016) ("When an earlier decision is cited not as a binding precedent but as persuasive authority, its value is enhanced by

6

sound, acute, and logical reasoning; by internal evidence that the case received the careful consideration of the court; and by the citation of pertinent authorities. Its value is diminished by the absence of any of these characteristics."). I do not share the optimism of the en banc opinion that the authors of these opinions must have thoughtfully considered whether an adverse employment action was required to state a reasonable-accommodation claim. Perhaps my view is based only on self-examination, but I think it is asking quite a bit of judges to expect them to examine every nuance of the issues in the case, considering circumstances that not only are absent from the case before the judge but are rarely if ever present in litigation before the courts, and then to craft every sentence in their opinions so carefully that there can be no mistake about the limits of their statements of the law. It is not unusual for courts to use language that is too broad or imprecise. How often do appellate courts state when they review a grant of summary judgment that they will apply "the same standard as the district court"? Yet it would be foolish to apply the same standard as the district court when the district court applied the wrong standard. Consider also how often we state that a statute is constitutional or a jury instruction was correct, when we really mean only that we are rejecting the specific challenges to the statute or jury instruction in that case. In short, we should be reluctant to treat opinions as persuasive on propositions for which there is no supporting analysis.

My skepticism about whether the cited authorities considered whether an adverse employment action (or at least something relating to the terms, conditions, or privileges of employment) is required for a failure-to-accommodate claim is enhanced by what happened in this case. The en banc opinion points out that the EEOC regulations and

7

manual for the ADA discuss the reasonable-accommodation requirement without saying anything about an adverse-employment-action requirement, and it infers from this omission that the EEOC believes that there is no such requirement in failure-to-accommodate cases. I drew no inference from that omission, because the reasonable-accommodation regulations and manual are addressing only the law specifically stating the reasonable-accommodation requirement. There is no need to address global requirements in each portion of the regulations or manual that concerns specific types of discrimination. And indeed, the amicus brief of the federal government shows that the en banc opinion's inference is incorrect. The amicus brief was in harmony with the panel majority, not the panel dissent, when it stated unequivocally that "to prevail on a failure-to-accommodate claim under Title I, a qualified individual must show that a denied accommodation pertains to her terms, conditions, or privileges of employment." Government Amicus Br. at 14. (What it criticized about the panel opinion was this court's interpretation—over the years and in claims under Title VII as well as the ADA—of the statutory language by, in the government's view, defining *adverse employment action* too narrowly.) The government's responses at oral argument forcefully confirmed its position that, contrary to the en banc majority opinion, the statutory language requiring that discrimination be "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment", 42 U.S.C. § 12112(a), applies to failure-to-accommodate claims.

8

Finally, a few words about the implications of the en banc opinion. I am confident that it will not escape the attention of the employment-law bar that all of the opinion's textual argument against imposing an adverse-employment-action requirement applies to every employment-discrimination claim, whether under the ADA, Title VII, or otherwise. After all, the term *adverse employment action* does not appear in any of those statutes and all of those statutes define discrimination as conduct we would find offensive, often abhorrent, regardless of the effect on a victim's employment. True, the en banc opinion also presents a policy reason for not imposing an adverse-employment-action requirement in failure-to-accommodate claims. But the argument strikes me as deeply flawed. In essence it states that Congress wanted to develop the full potential of every disabled employee and required employers to make all reasonable efforts to accomplish that, regardless of its impact on the disabled person's employment. That is certainly a worthy aspiration. But is it any worthier than prohibiting racial, gender, or religious discrimination against every employee, even if the discrimination is only the "inconvenience" of a less-attractive office or more-distant parking space? It appears to me from the statutory language that Congress did not want to "make a federal case" of every incident of discrimination in the workplace—even failures to accommodate. But if we are to be consistent with the en banc opinion, this circuit will need to come up with some better justification for applying the adverse-employment-action requirement in typical employment-discrimination cases.